1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| DONNA HOFFMAN, ) | CIV F 04-5714 AWI DLB |
| ) | |
| Plaintiff, ) | ORDER ON DEFENDANT |
| v. ) | MEMORIAL MEDICAL |
| ) | CENTER'S MOTION FOR |
| KENT TONNEMACHER, M.D.; ) | PARTIAL SUMMARY |
| UNKNOWN PHYSICIANS; ) | JUDGMENT |
| MEMORIAL MEDICAL CENTER, ) | |
| ) | |
| Defendants. ) | |
| ————————————————— ) | |

11
12
13
14
15
16
17

18      This case arises out of the May 22, 2003, visit by Plaintiff Donna Hoffman ("Hoffman")

19  to the emergency department of Defendant Memorial Medical Center ("MMC") where she was

20  seen by Co-Defendant Dr. Kent Tonnemacher.  Dr. Tonnemacher diagnosed Hoffman as having

21  bronchitis with a differential diagnosis of pneumonia and discharged her with antibiotics the

22  same day.  On May 23, 2003, Hoffman returned to MMC in an ambulance and went into septic

23  shock.  After a lengthy hospitalization, Hoffman survived her sepsis and was released.  On May

24  14, 2004, she brought suit against MMC and Dr. Tonnemacher for violations 42 U.S.C. § 1395dd

25  (the Emergency Medical Treatment and Active Labor Act ("EMTALA")), and California law

26  medical malpractice.  MMC moves for partial summary judgment on Hoffman's EMTALA

27  claims and, in the event that partial summary judgment is granted, for this Court to decline to

28  exercise jurisdiction over the state law malpractice claims.  For the reasons that follow, MMC's

motion will be GRANTED in part and DENIED in part.[1]

**FACTUAL BACKGROUND**

On May 22, 2003, Hoffman presented to the Emergency Medical Department at MMC and was examined and treated by Dr. Tonnemacher, a board certified emergency department physician.[2]  Defendant's Undisputed Material Fact ("DUMF") No. 1.  Hoffman had a fever of 102.3˚, a pulse of 126, respiration of 24, a blood pressure of 159/87, and it was reported that Hoffman had a temperature of 106˚ when she was with the ambulance crew shortly before admission.  Plaintiff's Opposition to Undisputed Facts (hereinafter "PODUMF") at p.6; Tonnemacher Declaration Exhibit A.[3]  Hoffman was noted to have a medical history of hypertension, hypothyroidism, Hodgkin's lymphoma, a prior splenectomy, and a heart murmur at the time of her admission.  Id.; Tonnemacher Declaration at ¶ 4.  The medical records indicate that Hoffman's chief complaints were chills with hyperventilation, nasal congestion, cough, chest pain, and numbness in her hands.[4]  PODUMF at p.6; Tonnemacher Declaration at ¶ 4 & Exhibit A.  Dr. Tonnemacher took a medical history, performed a physical examination, and ordered x-rays and a urinalysis for Hoffman.  DUMF No. 2.  No blood culture, urine culture, CBC, blood differential, or other type of test was administered.  PODUMF at p. 6; Tonnemacher Declaration Exhibit A.

---

[1]This is MMC's second motion for summary judgment.  On June 9, 2005, this Court granted Hoffman's Rule 56(f) motion for additional discovery.

[2]Dr. Tonnemacher's declaration indicates that he examined Hoffman at 8:54 p.m.  Tonnemacher Declaration at ¶ 4.

[3]Hoffman has attached as Exhibit 2 to her opposition the medical records for her May 22, 2003, and May 23, 2003, presentations to MMC's emergency department.  The declaration of Dr. Tonnemacher contains the medical records for May 22, 2003 as Exhibit A, and the medical records for May 23, 2003 as Exhibit B.  A reference to Exhibit A or B of Dr. Tonnemacher's declaration is equivalent to a reference to Exhibit 2 of Plaintiff's opposition.

[4]Hoffman may have also been suffering from abdominal pain.  The notation in the medical record is unclear.  Dr. Tonnemacher does not indicate in his declaration that abdominal pain was a consideration, see Tonnemacher Declaration at ¶ 4, but Plaintiff's opposition indicates that she had abdominal pain.  See Plaintiff's Opposition to Undisputed Facts at p. 6.

daw                                          2

1    Based upon Dr. Tonnemacher's evaluation and work-up, and based upon Hoffman's

2 medical history, his examination and x-ray studies, Dr. Tonnemacher diagnosed fever and

3 bronchitis with a differential diagnosis[5] of possible pneumonia and ordered medications to

4 address Hoffman's condition.  DUMF No. 3.[6]  Dr. Tonnemacher did not believe that Hoffman

5 suffered from an emergency medical condition requiring further immediate medical attention, or

6 any additional treatment prior to her discharge, and that in his considered medical opinion,

7 Hoffman could be discharged without placing her overall health in jeopardy.  DUMF No. 4.[7]

8 However, Dr. Tonnemacher testified that given Hoffman's history and symptoms, a bacterial

9 illness/process was a potential concern.  Tonnemacher Deposition at 37:14-38:2.[8]  Dr.

10 Tonnemacher did not order additional tests.  PODUMF at p.6; Exhibit A to Tonnemacher

11 Declaration; see also Tonnemacher Declaration at ¶¶ 4-7.  Dr. Tonnemacher determined that

12 Hoffman's condition improved while in the emergency department on May 22, 2003, and he

13 discharged her with a prescription for an antibiotic.  DUMF No. 5.[9]  Dr. Tonnemacher prescribed

14

15

16      [5]A "differential diagnosis" is "the determination of which one of two or more diseases a patient is suffering
from, by systematically comparing and contrasting their clinical findings."  Harris v. Health & Hosp. Corp., 852
F.Supp. 701, 703-04 (S.D. Ind. 1994) (quoting Dorland's Medical Dictionary, 27th Ed., at 461).

17

18      [6]Hoffman disputes DUMF No. 3 as being incomplete.  This does not dispute the substance of the proposed
DUMF; additionally, the Court has included within the factual background the facts identified by Hoffman that
arguably make DUMF No. 3 incomplete.

19

20      [7]Hoffman disputes this DUMF by arguing that it is irrelevant because EMTALA requires a screening exam
to be appropriate in light of the patient's presenting symptoms and does not limit a screening exam to those
conditions that a physician actually believes exist.  Hoffman's objection of irrelevance is not well taken.  The
21 proposed fact is relevant to the issue of stabilization, which looks to the actual knowledge of the hospital staff.

22      [8]MMC has provided deposition excerpts from Dr. Tonnemacher's deposition.  See January 18, 2006,
Martini Declaration Exhibit A.  Also, Hoffman has lodged the entire transcript of Dr. Tonnemacher's deposition.
23 However, the numbering in these submissions is different.  Since Plaintiff has lodged the entire deposition, the Court
will cite to the deposition lodged by Plaintiff, which is document 50 in the Court's docket.

24

25      [9]Hoffman disputes this DUMF by arguing that it is a self-serving statement by Dr. Tonnemacher and is
"disputed by the medical facts and plaintiff's disastrous course;" further, even if genuinely believed, such a statement
is the result of an inappropriate medical screening.  Plaintiff's Opposition to DUMF No. 5.  However, the fact is
26 relevant to the issue of stabilization, which looks to the actual knowledge of the hospital staff.  Further, that
Hoffman's condition deteriorated after discharge while she was at home does not refute the proposition that her
27 condition had improved while at the emergency room.

28 daw                                     3

1    an antibiotic for Hoffman because, based on his course of treatment, he had not been able to rule

2    out a bacterial process.  Id. at 43:16-20.  In the opinion of Dr. Tonnemacher, Hoffman was not

3    suffering from an emergency medical condition on May 22, 2003, either at the time she presented

4    in the emergency department or at the time of her discharge.  DUMF No. 6.[10]  Hoffman was

5    discharged at 10:45 p.m. on May 22, 2003, with a 102.5˚ fever and an elevated pulse of 124.

6    PODUMF at p.6; Tonnemacher Declaration Exhibit A.

7         MMC argues that, at the time of her discharge on May 22, 2003, Hoffman was discharged

8    in a stable condition with an appropriate antibiotic prescription and no additional medical

9    screening or diagnostic testing was indicated at that time.  DUMF No. 7.[11]  Further, that the

10   screening, examination, and treatment provided to Hoffman at MMC on May 22, 2003, was the

11   same screening, examination, and treatment that any similarly situated patient presenting to the

12   emergency department at MMC would have received at that time.  DUMF No. 8.  Dr.

13   Tonnemacher's care and treatment rendered to Hoffman in the emergency department on May

14   22, 2003, was appropriate and designed to identify all signs and symptoms that would indicate

15   the need for immediate medical attention to prevent serious bodily injury, and was in full

16   compliance with EMTALA.  DUMF No. 9.  Dr. Tonnemacher's examination, assessment, and

17   treatment of Hoffman on May 22, 2003, complied with the MMC guidelines and protocols

18   relating to examination and treatment of patients in the emergency department presenting with

19   similar symptoms.  DUMF No. 10.

20        Hoffman disputes DUMF Numbers 7, 8, 9, and 10.  Hoffman submits that Dr.

21   Tonnemacher testified that, of the approximately six patients who were non-elderly individuals

22

23   [10]Hoffman disputes this DUMF by arguing that it is irrelevant, incomplete because Tonnemacher suspected
     an ongoing bacterial process, and "disputed generally" because the "overwhelming weight of the expert and medical

24   evidence" show that Hoffman was suffering from a serious bacterial process on May 22, 2003.  DUMF No. 6 is
     relevant to the issue of stabilization.  Plaintiff is correct that a dispute exists as to whether Hoffman was actually

25   suffering from an emergency medical condition on May 22, 2003.  See Goldman Declaration at ¶¶ 4-6.  However,
     this dispute is not necessarily material to either the appropriateness of the screening or the issue of stabilization.

26

27   [11]There is a disputed issue of fact as to DUMF No. 7.  Plaintiff's experts both opine that additional tests
     were indicated.  See Bronston Declaration at ¶¶ 4-6; Goldman Declaration at ¶ 4.  DUMF No. 7 is not established.

28

and whom he suspected had an ongoing bacterial process, Hoffman was the only one who was

discharged without receiving a blood test.  Plaintiff's Opposition to DUMF Nos. 8-10;

Tonnemacher Deposition at 43-46, 52-53, 93, 97.  Further, Hoffman submits that Dr.

Tonnemacher failed to comply with MMC's EMTALA compliance policy because he did not

tailor his emergency screening to address the emergency conditions that he considered

possibilities, i.e. he discharged Hoffman even though he suspected she had an ongoing bacterial

process.  Plaintiff's Opposition to DUMF Nos. 8-10; Hastie Deposition at 29-30.  Finally, since

Tonnemacher did not order a blood culture, CBC, blood differential, and/or an echocardiogram,

which were within MMC's capabilities, his screening was inappropriate in that it was not

reasonably calculated to identify the emergency condition he himself admitted to suspecting.

Plaintiff's Opposition to DUMF Nos. 7-10; Bronston Declaration at ¶¶ 4-6;[12] Goldman

Declaration at ¶¶ 4-6.[13]

      After the May 22, 2003, discharge, Hoffman returned to MMC's emergency room via

ambulance seventeen hours later on May 23, 2003, at approximately 4:00 p.m., in a septic

condition and went into septic shock.  PODUMF at p.6; Tonnemacher Declaration Exhibit B.  At

6:02 p.m. blood cultures were delivered to MMC's laboratory, and the results came back on May

24, 2003, at 4:12 a.m., ten hours later; and showed that Hoffman had a virulent bacterial

infection, with the streptococcus pneumonia bacterial identified.  Id.; see also Olson Deposition

at 25:11-13.  Dr. Olson, an infectious diseases physician who treated Hoffman, opined that the

blood culture becoming positive in a relatively short period of time suggested a very serious

problem and showed that the amount of bacteria in her bloodstream was quite high.[14]  Olson

---

[12]Dr. Bronston's Declaration is part of Plaintiff's expert disclosures and is Exhibit B to the January 18, 2006, Declaration of Alan Martini.

[13]Dr. Goldman's Declaration is part of Plaintiff's expert disclosures and is Exhibit C to the January 18, 2006, Declaration of Alan Martini.

[14]However, when asked whether he "could say with any degree of probability how long prior that [the] bacteria had been introduced in [Hoffman]," Olson replied, "Can make no comment."  Olson Deposition at 26:4-8.

daw                                                          5

1   Deposition at 25:7-21.  At the time Hoffman returned to the emergency department on May 23,

2   2003, her condition had changed and Hoffman presented with additional and different symptoms

3   from those of her May 22, 2003 presentation.  DUMF No. 11.[15]  For instance, on May 23, 2003,

4   Hoffman presented with new symptoms, including diarrhea, diaphoresis, oral cyanosis, and gray

5   skin appearance; additionally, her blood pressure was markedly abnormal and her heart rate was

6   higher than it was on May 22, 2003, and she was in respiratory distress.  DUMF No. 12.[16]

7   Following her presentation to the emergency department on May 23, 2003, Hoffman was

8   admitted to the intensive care unit at the hospital in critical condition.  DUMF No.13.  Hoffman

9   survived her sepsis, but suffered permanent physical damage, and was apparently discharged on

10  July 30, 2003.  On May 14, 2004, Hoffman brought suit against MMC and Dr. Tonnemacher for

11  violations of EMTALA and state law medical malpractice.

12                          **Plaintiff's Experts's Declarations**

13          Both parties rely on the declarations of Hoffman's expert witnesses, Dr. Peggy Goldman

14  and Dr. Paul Bronston.  In pertinent part, Dr. Goldman declares:

15      4.      [I]t is my opinion that the screening examination and emergency treatment
                received from Dr. Tonnemacher and [MMC] on May 22, 2003, departed
16              from the applicable standards of care and were inappropriate as that term
                is defined under [EMTALA].  Specifically, the history obtained from the
17              plaintiff by the triage nurse and Dr. Tonnemacher on May 22, 2003, raised
                a significant possibility that she could be suffering from a bacterial
18              infection, including bacterial endocartis, a most serious emergency
                condition.  This possibility should have been recognized by a competent
19              emergency medical practitioner based on the history obtained from
                plaintiff and her presentation upon being examined.  Under these
20              circumstances, an acceptable and appropriate medical screening had to
                include, at a minimum, a CBC, blood differential, blood cultures, and an

21

22          [15]Hoffman disputes this DUMF by arguing that the evidence suggests that Defendant was suffering from a
23  bacterial process on May 22, 2003, that this condition constituted an "emergency condition," and her condition on
    May 23, 2003, was but a continuation and deterioration of that bacterial process.  However, this does not dispute the
24  DUMF.  The DUMF stands for the proposition that Hoffman's physical condition had changed and that she
    presented with different symptoms from her prior presentation.  A deterioration, by definition, indicates a change in
25  condition.  Hoffman's opposition does not actually dispute DUMF No. 11.

26          [16]Hoffman makes the same argument in disputing DUMF No. 12 as she did in disputing DUMF No. 11.
    However, Hoffman's argument does not contradict or dispute that Hoffman indeed presented with new symptoms on
27  May 23, 2003.  Hoffman's opposition does not actually dispute DUMF No. 12.

28  daw                                               6

echocardiogram, none of which was ordered or done as part of the plaintiff's emergency screening examination. These necessary screening measures are clearly within the capability of any hospital having an emergency department and had to be ordered and done without delay.

5.    The plaintiff also did not receive stabilizing treatment in accordance with applicable standards of care and EMTALA. A patient with plaintiff's history and presentation required the administration of suitable intravenous antibiotics at the earliest possible time, and the patient's admission to the hospital had to be fully considered by a reasonably prudent practitioner as well. The failure of Dr. Tonnemacher and [MMC] to provide necessary and required stabilizing treatment resulted in plaintiff's being discharged in an unstable condition, i.e. her being discharged with a virulent, uncontrolled bacterial infection.

6.    The failure to provide a screening examination and stabilizing treatment in accordance with the standard of care and EMTALA under these circumstances creates an unacceptable risk of failing to identify and treat a potentially virulent bacterial process in a timely manner. This failure had disastrous results in plaintiff's case. Specifically, plaintiff had a reasonable medical probability of a better outcome, including the avoidance of a lengthy admission at [MMC], subsequent admissions to [another hospital], including subsequent surgical interventions, had she received an acceptable and appropriate screening examination and stabilizing treatment for the virulent bacterial process with which she presented on May 22, 2003. Plaintiff also lost the opportunity to achieve a better outcome with respect to her subsequent treatment as a result of Dr. Tonnemacher's and [MMC]'s failures to provide a screening examination and stabilizing treatment in accordance with the standard of care and EMTALA.

Goldman Declaration at ¶ 4.

Similarly, Dr. Bronston declares in relevant part:

4.    [I]t is my opinion that the screening examination and emergency treatment received by plaintiff on May 22, 2003, departed from the applicable standards of care and were inappropriate. Specifically, the history obtained from the plaintiff by the triage nurse and Dr. Tonnemacher on May 22, 2003, indicated that she was immunosuppressed, i.e., she had undergone a splenectomy. In addition, she had a recent cold/sinusitis for which she had been prescribed Keflex, and had various symptoms of a cold or infection upon her presentation to the emergency department, including a fever that may have been as high as 106˚ shortly before her presentation. Thus, plaintiff was an immunosuppressed patient at the time she presented to [MMC]'s emergency department on May 22, 2003, with signs and symptoms consistent with a bacterial infection.

5.    The standard of care for immunosuppressed patients presenting with symptoms and history similar to plaintiff's requires them to be considered as having an emergency medical condition until the contrary is demonstrated. Particularly, the standard of care requires that a blood

daw                                                                  7

1   culture and CBC panel be ordered and done without delay and that suitable
    intravenous antibiotics be administered at the earliest possible time and
2   that she be admitted to the hospital.  The failure to provide a screening
    examination and stabilizing treatment in accordance with the standard of
3   care under these circumstances creates an unacceptable risk of failing to
    identify and treat a potentially virulent bacterial process in a timely
4   manner.  This failure can have disastrous results.

5   6.      Although Dr. Tonnemacher obtained the history indicating that plaintiff
            was immunosuppressed and acknowledged that even a 102.3˚ fever in a
6           patient with her history is a potential concern (Tonnemacher Deposition at
            pp. 37-38), he failed to comply with the above-outlined standard of care.
7           This resulted in a substandard and inappropriate screening examination
            and in the failure to provide necessary stabilizing treatment, i.e. treatment
8           designed to ensure within a reasonable medical probability that the
            patient's condition does not materially deteriorate.
9
10  Bronston Declaration at ¶¶ 4-6.

11
                            **SUMMARY JUDGMENT STANDARD**
12
13          Summary judgment is appropriate when it is demonstrated that there exists no genuine

14  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

15  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

16  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

17  F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

18  undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

19  Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

20  case turns on a mixed question of law and fact and the only dispute relates to the legal

21  significance of the undisputed facts, the controversy for trial collapses into a question of law that

22  is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d

23  1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

24          Under summary judgment practice, the moving party always bears the initial
            responsibility of informing the district court of the basis for its motion, and
25          identifying those portions of "the pleadings, depositions, answers to
            interrogatories, and admissions on file, together with the affidavits, if any," which
26          it believes demonstrate the absence of a genuine issue of material fact.

27  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

28  daw                                           8

burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its

daw                                                                            9

contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>, 391 U.S. at 289; <u>Willis v. Pacific Maritime Ass'n</u>, 244 F.3d 675, 682 (9th Cir. 2001).  However, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>Hopper v. City of Pasco</u>, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587; <u>Mende v. Dun & Bradstreet, Inc.</u>, 650 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  <u>See</u> Rule 56(c); <u>Fortyune</u>, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  <u>See</u> <u>Southern Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255; <u>Matsushita</u>, 475 U.S. at 587; <u>Stegall v. Citadel Broad, Inc.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Mayweathers v. Terhune</u>, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); <u>UMG Recordings, Inc. v. Sinnott</u>, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d 15, 23 (1st Cir. 2002); <u>see also</u> <u>Bryant v. Adventist</u>

Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

### 28 U.S.C. § 1395dd – EMTALA

EMTALA is also known as the "Patient Anti-Dumping Act" and reflects the concern that "hospitals were dumping patients who could not pay for care, either by refusing to provide emergency treatment to these patients or by transferring [them] to other hospitals before [their] conditions stabilized."  Jackson v. East Bay Hospital, 246 F.3d 1248, 1254 (9th Cir. 2001).  Thus, "Congress enacted EMTALA to ensure that all individuals, regardless of their ability to pay, receive adequate emergency medical care."  Bryant, 289 F.3d at 1165.  Under EMTALA:

> [I]f any individual . . . comes to the emergency department [of a hospital that participates in the Medicare program] and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition  . . . exists.

42 U.S.C. § 1395dd(a); see also Bryant, 289 F.3d at 1165.

An "emergency medical condition" is a condition "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in -- (i) the placing of the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . ."  42 U.S.C. § 1395dd(1)(A); Jackson, 246 F.3d at 1254.

However, EMTALA does not establish a federal medical malpractice cause of action nor does it establish a national standard of care.  Bryant, 289 F.3d at 1165; Baker v. Adventist

Health, Inc., 260 F.3d 987, 995 (9th Cir. 2001); Jackson, 246 F.3d at 1255.  "In general,

questions regarding whether a physician or other hospital personnel failed properly to diagnose or

treat a patient's condition are best resolved under existing and developing state negligence and

medical malpractice theories of recovery."  Vickers v. Nash General Hosp., 78 F.3d 141, 142

(4th Cir. 1996).  A hospital "does not violate EMTALA if it fails to detect or  misdiagnoses an

emergency condition," and the remedy of a person so injured is through a state law medical

malpractice claim.  Bryant, 289 F.3d at 1165; Baker, 260 F.3d at 993.  As the First Circuit has

explained, under EMTALA, "the issue is not what deficiencies in the standard of emergency

room care contributed to a misdiagnosis . . . the issue is whether the procedures followed in the

emergency room, even if they resulted in a misdiagnosis, were reasonably calculated to identify

the patient's critical medical condition."  Agosto, 299 F.3d at 21.  Instead of a universal standard

of medical care, "EMTALA imposes two duties on hospital emergency rooms: a duty to screen a

patient for an emergency medical condition, and, once an emergency condition is found, a duty to

stabilize the patient before transferring or discharging him."  Baker, 260 F.3d at 992; see 42

U.S.C. § 1395dd(a), (b).

A hospital meets its obligation to provide an "appropriate medical screening" under

EMTALA when it:

> provides a patient with an examination comparable to the one offered to other
> patients presenting similar symptoms, unless the examination is so cursory that it
> is not designed to identify acute and severe symptoms that alert the physician of
> the need for immediate medical attention to prevent serious bodily injury.

Baker, 260 F.3d at 995; Jackson, 246 F.3d at 1256; Eberhardt v. City of Los Angeles, 62 F.3d

1253, 1258-59 (9th Cir. 1995); see also Correa v. Hospital San Francisco, 69 F.3d 1184, 1192

(1st Cir. 1995) (a hospital must provide a screening exam that is "reasonably calculated to

identify critical medical conditions that may be afflicting symptomatic patients and provides that

level of screening uniformly to all those who present substantially similar complaints.").  "The

essence of this requirement is that there be some screening procedure, and that it be administered

even-handedly."  Correa, 69 F.3d at 1192.  To satisfy the uniformity of treatment requirement,

courts have held that "the test is whether the challenged procedure was identical to that provided [to] similarly situated patients as opposed to whether the procedure was adequate as judged by the medical profession." Eberhardt, 62 F.3d at 1258 (citing cases from the D.C., Fourth, and Sixth Circuits). EMTALA does not require hospitals to provide identical screening to patients presenting with different symptoms and does not require hospitals to provide screenings that are beyond their capabilities. Baker, 260 F.3d at 995. Since hospitals are generally in the best position to assess their own capabilities, "a standard screening policy for patients entering the emergency room generally defines which procedures are within a hospital's capabilities." Id. Additionally, the touchstone for whether a screening provided to a patient is appropriate is "whether, as § 13955dd(a) dictates, the procedure is designed to identify an 'emergency medical condition' that is manifested by 'acute' and 'severe' symptoms." Jackson, 246 F.3d at 155; Eberhardt, 62 F.3d at 1358; see also Correa, 69 F.3d at 1192.

Conversely, a failure to provide any screening, the provision of a "cursory screening" that amounts to no screening at all in that it is not designed to detect acute and severe symptoms, and disparate treatment such as the hospital's failure to follow its own screening procedures, may all constitute a breach of the hospital's duty to provide an appropriate medical screening to a patient seeking emergency treatment. See 42 U.S.C. § 1395dd(a); Bryant, 289 F.3d at 1166; Baker, 260 F.3d at 994-95; Jackson, 246 F.3d at 1256; Correa, 69 F.3d at 1192-93; Eberhardt, 62 F.3d at 1258-59; Feighery v. York Hosp., 59 F.Supp.2d 96, 107-09 (D. Me. 1999). To recover for disparate treatment, the plaintiff must proffer evidence "sufficient to support a finding that she received materially different screening than that provided to others in her condition. It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in the plaintiff's position." Reynolds v. Mainegeneral Health, 218 F.3d 78, 84 (1st Cir. 2000); see also Vickers, 78 F.3d at 143-44. "It is the plaintiff's burden to show that the hospital treated her differently from other patients; a hospital is not required to show that it had a uniform screening procedure." Marshall v. East Carroll Parish Hosp. Serv., 134 F.3d 319, 323-24 (5th Cir. 1998).

However, a de minimus deviation from a hospital's standard screening policy is insufficient to establish a violation of EMTALA.  Repp v. Anadarko Municipal Hospital, 43 F.3d 519, 523 (10th Cir. 1994); Feighery, 59 F.Supp.2d at 109; see also Vargas by & through Gallardo v. Del Puerto Hosp., 98 F.3d 1202, 1205 (9th Cir. 1996).  Further, where a claim of inappropriate screening is based on a "failure to provide certain diagnostic tests," a plaintiff "must at least address whether the hospital was capable of performing such tests."  Agosto, 299 F.3d at 22.  However, negligence in the screening process or the provision of a merely faulty screening, as opposed to refusing to screen or disparate screening, does not violate EMTALA, although it may implicate state malpractice law.  See Agosto, 299 F.3d at 21; Marshall, 134 F.3d at 323-24; Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1139 (8th Cir. 1996) (en banc); Correa, 69 F.3d at 1192-93; see also Jackson, 246 F.3d at 1255-56.

Finally, where an individual comes to a hospital and "the hospital determines that the individual has an emergency medical condition, the hospital must provide . . . within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition [or transfer the individual to another facility]."  42 U.S.C. § 1395dd(b)(1); Eberhardt, 62 F.3d at 1256; Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991).  "Stabilize" means "to provide such medical treatment of the condition as may be necessary to assure with reasonable medical probability that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from the facility."  42 U.S.C. § 1395dd(e)(3)(A); Bryant, 289 F.3d at 1165.  Stabilization is determined in reference to a patient's diagnosis, not what in hindsight a patient "turns out to have," and evaluated at the time of discharge.  Vickers, 78 F.3d at 145; Bergwall v. MGH Health Servs., 243 F.Supp.2d 364, 374-375 (D. Md. 2002).  However, the duty to stabilize "arises only when [the hospital] actually detects an emergency medical condition."  Baker, 260 F.3d at 992-93; Jackson, 246 F.3d at 1257.  When the hospital does not actually detect or have actual knowledge of an emergency medical condition, the hospital owes no duty to stabilize

1  under EMTALA.  See Summers, 91 F.3d at 1140; Vickers, 78 F.3d at 145; Eberhardt, 62 F.3d at

2  1259; see also Gatewood, 933 F.2d at 1041 (holding the duty to stabilize applies only after a

3  hospital determines that an emergency medical condition exists).

4

5                                  **DISCUSSION**

6        MMC seeks summary judgment on Hoffman's EMTALA "appropriate medical

7  screening" and "stabilization" claims.  Hoffman's opposition is rather global in nature.  Hoffman

8  essentially lists various facts and aspects of various testimony and argues that this evidence

9  creates "myriad patent factual disputes."  After listing the facts, which are supported by citations

10  to exhibits, depositions, and declarations, Hoffman argues that the record viewed in the light

11  most favorable to her would permit a jury to find:

12       (1)    Dr. Tonnemacher recognized based on Hoffman's history and presentation that
13                her symptoms were consistent with a possible bacterial infection, which clearly
                  constitutes a potential emergency condition;

14       (2)    By not including at a minimum a blood culture, a blood differential,[17] a CBC,[18]
15                and echocardiogram[19] as part of his screening, Dr. Tonnemacher performed an
                inappropriate screening that was not reasonably calculated to determine if
                Hoffman's symptoms were manifestations of an emergency condition;

16
17       (3)    Dr. Tonnemacher treated Hoffman differently than the other six patients he
                recalled treating in the last three years whom he discharged despite suspecting an
18                ongoing bacterial process in that he did not include a blood culture as part of his
                screening exam, even though he recognized that blood cultures are the best way of
                identifying a bacterial infection and the appropriate antibiotic;

19
20       (4)    Dr. Tonnemacher failed to comply with MMC's EMTALA compliance policy by
                not tailoring his screening exam to the potential emergency conditions that he

21

22        [17]The Court assumes that what is meant by "blood differential" is "differential white blood count" which is
  "an estimate of the percentage of each white blood cell type making up the total white blood cell count."  Stedman's
23  Medical Dictionary, 27th Ed., p.215.

24        [18]C.B.C. is a "complete blood count" and is a "combination of the following determinations:  red blood cell
  count, white blood cell count, erythrocyte indices, hematocrit, differential blood count, and sometimes platelet
25  count."  Stedman's Medical Dictionary, 27th Ed., p.215.

26        [19]Echocardiogram is "the record obtained by echocardiography," which is the "use of ultrasound in the
  investigation of the heart and great vessels and diagnosis of cardiovascular lesions."  Stedman's Medical Dictionary,
27  27th Ed., p.563.

28  daw                      15

himself identified and thereby provided Hoffman with a disparate screening;

(5)     By being discharged with no improvement in her condition, which is recognized by Dr. Tonnemacher and Hoffman's experts as a potentially serious emergency condition, Hoffman was discharged in an unstable condition;

(6)     MMC had within its capabilities the ability to provide an EMTALA compliant screening and stabilizing treatment on May 22, 2003;

(7)     Hoffman's blood culture result and subsequent medical course shows that she did indeed have an emergency condition at the time of her May 22, 2003 presentation; and

(8)     Hoffman's presentation on May 23, 2003 was a continuation of the same condition for which she was inappropriately screened and discharged under EMTALA.

Plaintiff's Opposition at 21-22.  These "Potential Jury Findings" will be referred to as "PJF's."


**A.     Failure To Provide An "Appropriate Medical Screening"**

     **1.**     <u>Screening Not Reasonably Calculated To Determine The Existence Of An Emergency Condition</u>

*Defendant's Argument*

MMC relies primarily on the declaration and deposition of Dr. Tonnemacher.  MMC argues that Hoffman was properly triaged by the nursing staff and examined by Dr. Tonnemacher.  Dr. Tonnemacher personally took Hoffman's history, performed a physical examination, and ordered diagnostic tests, i.e. a chest x-ray and urinalysis.  Dr. Tonnemacher diagnosed Hoffman as having bronchitis, with a differential diagnosis of possible pneumonia. Dr. Tonnemacher declared that his screening of Hoffman was the same that comparably situated patients would have received at MMC, that the screening was appropriate under the circumstances given the symptoms and findings, and that the screening was designed by him to identify acute and severe symptoms that would alert him to the need for immediate medical attention to prevent serious bodily injury.  Tonnemacher Declaration at ¶¶ 6, 10, 11.

Also, MMC argues that the declarations Dr. Bronston and Dr. Goldman do not create a genuine issue of material fact.  Dr. Bronston's and Dr. Goldman's opinions are limited to a

conclusion that Dr. Tonnemacher's treatment and examination departed from the applicable

standard of care.  These doctors do not opine that the examination was so cursory as to constitute

no screening or that the challenged screening differed from the examination provided to other

comparable patients.  Further, Dr. Goldman's opinion is a bare legal conclusion.  These expert

opinions are not relevant to EMTALA and, thus, argues MMC, summary judgment is

appropriate.

_Plaintiff's Opposition_

Hoffman relies on PJF's 1, 2, and 6 to argue that summary judgment is inappropriate.

PJF 1 states that Dr. Tonnemacher recognized that a bacterial process was consistent with

Hoffman's presentation.  Dr. Tonnemacher testified that one of the emergency conditions that

can cause a fever is a bacterial infection, see Tonnemacher Deposition at 28:3-14, that with

Hoffman a bacterial illness was "a potential concern," Id. at 37:16-38:2, and that one of the

reasons he ordered an antibiotic at discharge was that he could not rule out an ongoing bacterial

process.  Id. at 43:12-20.

PJF's 2 and 6 state that Dr. Tonnemacher's screening was inappropriate and not

reasonably calculated to detect an emergency medical condition because certain tests were not

ordered even though it was in MMC's capability to perform such tests.  Both of these findings

are based on the expert declarations of Dr. Bronston and Dr. Goldman.   Dr. Bronston declared

that Tonnemacher's screening examination and treatment "departed from the applicable

standards of care and were inappropriate" because Hoffman's medical history and presentation

showed her to be immunosuppressed and febrile with symptoms consistent with a bacterial

infection.  Bronston Declaration at ¶ 4.  Similarly, Dr. Goldman declares that Hoffman's

screening examination and treatment "departed from the applicable standards of care and were

inappropriate as that term is defined under [EMTALA]."  Goldman Declaration at ¶ 4.  Dr.

Goldman declared that an appropriate medical screening had to include, at a minimum, a CBC,

blood differential, blood cultures, and an echocardiogram, none of which was ordered or done as

daw

17

part of Hoffman's emergency medical screening examination.  Id.

*Resolution*

Hoffman's argument rests on the declarations of Dr. Bronston and Dr. Goldman. However, as MMC correctly points out, these declarations are primarily in the language of medical malpractice law with several references to EMTALA thrown in.

As quoted above, Dr. Bronston opines that Dr. Tonnemacher's screening and treatment "departed from the applicable standard of care and were inappropriate."  Bronston Declaration at ¶ 4.  After listing Hoffman's symptoms and classifying her as "immunosuppressed," he describes the "standard of care for an immunosuppressed" patient like Hoffman and how a failure to follow the "standard of care" creates unacceptable risks.  Id. at ¶ 5.  Dr. Bronston concludes that Dr. Tonnemacher "failed to comply with the above-outlined standard of care," and that this "failure resulted in a substandard and inappropriate screening examination . . . ."  Id. at ¶ 6.

Dr. Goldman's opinions are almost identical to Dr. Bronston's except she expressly references EMTALA.  Dr. Goldman declares that Dr. Tonnemacher's screening "departed from the applicable standards of care and were inappropriate as that term is defined under [EMTALA]."  Goldman Declaration at ¶ 4.  Goldman declares that Hoffman's history indicated that she could be suffering from an emergency condition, bacterial endocartis.  Id.  Goldman continues that this possibility "should have been recognized by a competent emergency medical practitioner based on the history obtained from plaintiff and her presentation upon being initially examined," and that, under the circumstances, "an acceptable and appropriate medical screening had to include, at a minimum, a CBC, blood differential, blood culture, and echocardiogram."  Id.  Dr. Goldman concluded that, the "failure to provide a screening examination . . . in accordance with the standard of care and EMTALA under these circumstances creates an unacceptable risk of failing to identify and treat a potentially virulent bacterial process in a timely manner."  Id. at ¶ 5.

The crux of Dr. Bronston's and Dr. Goldman's declarations is to equate the applicable

standard of care with an appropriate medical screening.  They essentially state either that Hoffman was immunosuppressed and had to be treated as if she had a bacterial process, see Bronston Declaration at ¶ 5, or state that Dr. Tonnemacher should have recognized and tested for bacterial infections, such as bacterial endocarditis, through additional tests.  See Goldman Declaration at ¶ 4.  Although Dr. Goldman mentions EMTALA and states that Dr. Tonnemacher's screening was "inappropriate" as defined by EMTALA, she does not explain what she means by "inappropriate" and the remainder of her declaration does not show a distinction between the "applicable standard of care" and an "appropriate medical screening;" it appears that a deviation from the standard of care is the same as an inappropriate screening to Dr. Goldman.  See Goldman Declaration at ¶¶ 4-6.  The problem is that EMTALA does not create a national standard of care and it is not a medical malpractice statute.  Bryant, 289 F.3d at 1165; Baker, 260 F.3d at 993; Jackson, 246 F.3d at 1255-56; see also Reynolds, 218 F.3d at 84 ("It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in the plaintiff's position."); Vickers, 78 F.3d at 142-45.  A mere faulty or negligent screening or a misdiagnosis is not a violation of EMTALA.  Agosto, 299 F.3d at 21;  Jackson, 246 F.3d at 1255-56; Marshall, 134 F.3d at 323-24; Summers, 91 F.3d at 1139; Vickers, 78 F.3d at 143-45; Correa, 69 F.3d at 1192-93.  A "treating physician's failure to appreciate the extent of the patient's injury or illness . . . may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening."  Marshall, 134 F.3d at 323; see also Jackson, 246 F.3d at 1255-56.

Dr. Tonnemacher declared that he examined Hoffman and ordered a chest x-ray and a urinalysis, that his screening was designed to identify symptoms that would indicate the need for immediate medical treatment, that the results of the physical examination and test results indicated a viral etiology, that he made a diagnosis of bronchitis with a differential diagnosis of possible pneumonia, and that he prescribed medications to address Hoffman's condition.  See Tonnemacher Declaration at ¶¶ 5-6, 11.  Neither Dr. Bronston nor Dr. Goldman discuss the chest

x-ray and urinalysis that were ordered by Dr. Tonnemacher, let alone explain why those tests were not designed to identify an emergency condition that may have been affecting Hoffman. Dr. Goldman's and Dr. Bronston's criticisms are nothing more than a criticism of Dr. Tonnemacher's medical diagnosis and medical judgment and an identification of the shortcomings that led to an arguable misdiagnosis of viral bronchitis instead of a diagnosis of bacterial infection.  The criticisms of Dr. Tonnemacher for failure to order additional tests are simply criticisms of violating the applicable medical standard of care, they do not show a screening so cursory that it was not designed to detect emergency conditions that may have been afflicting Hoffman.  See Agosto, 299 F.3d at 21; Bryant, 289 F.3d at 1165-66; Baker, 260 F.3d at 993; Jackson, 246 F.3d at 1255-56; Reynolds, 218 F.3d at 84; Marshall, 134 F.3d at 323; Vickers, 78 F.3d at 142-45; Eberhardt, 62 F.3d at 1258; Roa Gil v. Dr. Alejandro Otero Lopez Hosp., 273 F.Supp.2d 180, 184 (D.P.R. 2003); Feighery, 59 F.Supp.2d at 108-09;  Fisher by Fisher v. New York Health & Hosp. Corp., 989 F.Supp. 444, 449-50 (E.D. N.Y. 1998). Summary judgment on this theory is appropriate.

### 2.    Disparate Treatment

#### a.    Other Patients Treated By Dr. Tonnemacher

*Defendant's Argument*

Defendant argues that, in his deposition, Dr. Tonnemacher testified that blood cultures are rarely ordered in an emergency department setting and that there is "provider discretion" whether to order blood cultures depending on the circumstances.  Tonnemacher Deposition at 81:21-84:10.  Dr. Tonnemacher further testified that in the six patients that he recalls ordering blood work prior to discharge, those patients had different symptoms from Hoffman, such as cellulitis.  Id. at 93:18-94:8.

*Plaintiff's Opposition*

Hoffman relies on PJF 3 to argue that summary judgment is inappropriate.  PJF 3 states that Dr. Tonnemacher treated Hoffman differently from six other patients, whom he suspected of

1  having a bacterial process, in that Hoffman was the only one who did not receive a blood culture

2  as part of her screening.  Dr. Tonnemacher conceded that a blood culture is the most reliable way

3  of identifying an ongoing bacterial process and is the most efficacious way of determining the

4  appropriate antibiotic.  Tonnemacher Deposition at 40, 42.  Hoffman characterizes Dr.

5  Tonnemacher's testimony as, "Of the approximately six adult, non-elderly patients Dr.

6  Tonnemacher discharged in the past three years with a suspected bacterial illness, Hoffman is the

7  only one for whom he did not order a blood culture prior to discharge.  Citing Tonnemacher

8  Deposition at 43-46, 52-53, 93, 97."  Plaintiff's Opposition 18:16-19.  Further, Plaintiff argues

9  that Dr. Tonnemacher conceded that the ordering of blood cultures can be considered part of the

10 emergency room screening.  Id. at 54.[20]

11     *Resolution*

12         In a series of deposition excerpts, Dr. Tonnemacher indicated that, in the last three years,

13 he has treated, discharged, and ordered blood cultures for approximately six non-elderly patients

14 whom he suspected of having an on-going bacterial process.  Tonnemacher Deposition at 52:19-

15 24.  Dr. Tonnemacher further acknowledges that, unlike those six patients, he did not order a

16 blood culture for Hoffman.[21]  Id. at 52:25-53:4; 93:15-24.  However, Dr. Tonnemacher indicated

17 that these six patients did not have the same symptoms as Hoffman.  In particular, Dr.

18 Tonnemacher testified:

19     **Q:     Doctor, in follow-up to that, why don't we ask the question that we've been
            beating around for the last ten minutes here.**

20

21     A:     Sure.

22     **Q:     What is the difference clinically between the six or so patients that did
            receive a blood work prior to discharge and many patients like Mrs.
            Hoffman that are discharged without such blood work?**

23

24     _____

       [20]The testimony is not clear that Dr. Tonnemacher agreed that a blood exam is part of the emergency
25 screening exam.  In fact, at pages 53 through 55 of his deposition, Dr. Tonnemacher states that a blood culture is not
   part of an emergency room screening exam.

26
       [21]The "six patients" figure is based on estimations by Dr. Tonnemacher.  Tonnemacher Deposition at 45:12-
27 15; 47:13-22.

28 daw                                      21

A:      The ones that come to mind would be the ones with cellulitis,[22] without open wounds, with the epidemiology of MRSA.[23]  We put them on antibiotics as we discharge them, draw the blood cultures, if they had an open wound, we'd draw the culture from the wound, but the majority of the time there is cellulitis, just a general erythema,[24] and we draw the blood culture, put them on antibiotics that we assume should cover that infection and that is common placed, and that's the answer to that question.

Q:      **Now, did you in your medical screening examination of Mrs. Hoffman make any findings or become aware of any symptoms that would cause you to order blood tests?**

A:      No.

Q:      **So Mrs. Hoffman didn't have cellulitis, for instance?**

A:      Correct.

Q:      **And Mrs. Hoffman did n't have any open sores that might warrant further blood tests?**

A:      Correct.

Q:      **Was there anything about Mrs. Hoffman's presentation in the emergency department that would indicate need for blood tests?**

A:      No.

Tonnemacher Deposition at 94:9-95:18.

From the above, the estimated six patients whom Dr. Tonnemacher discharged and for whom he also ordered a blood culture were not similarly situated to Hoffman.  These patients had cellulitis, erythema, open sores, and/or possibly MRSA.  See id.  These are different symptoms from that expressed by Hoffman on May 22, 2003.  See id. at 94:9-95:3; Tonnemacher Declaration at ¶¶ 4-6 & Exhibit A; PODUMF at p.6.  EMTALA requires a hospital to provide "a patient with an examination comparable to the one offered to other patients presenting similar

---

[22]"Cellulitis" is an "inflammation of subcantaneous, loose connect connective tissue."  Stedman's Medical Dictionary, 27t h Ed., p. 317.

[23]"MRSA"is "methicillin-resistant Staphylococcus aureus."  See www.mercksource.com/pp/us/cns/cns_hl_dorlands.jspzQzpgzEzzSzppdocszSzuszSzcommonzSzdorlandszSzdorland zSzdmd_m_21zPzhtm

[24]"Erythema" is "redness due to capillary dilation."  Stedman's Medical Dictionary, 27th Ed., p.615.

daw                                                                22

1  symptoms." Baker, 260 F.3d at 995; Jackson, 246 F.3d at 1256; Eberhardt, 62 F.3d at 1258-59.

2  EMTALA does not require hospitals to provide identical screening to patients presenting with

3  different symptoms.  Baker, 260 F.3d at 995.  Because Hoffman did not have the same

4  "dispositive" symptoms as the six other patients, as explained by Dr. Tonnemacher, EMTALA

5  did not mandate that Hoffman receive the same treatment/screening as the other six.  Baker, 260

6  F.3d at 995.  Hoffman has failed to show disparate treatment compared to the six other patients

7  treated by Dr. Tonnemacher.  Summary judgment in favor of MMC is appropriate on this theory.

8  See Baker, 260 F.3d at 995.

9              **b.      Failure To Follow MMC's EMTALA Policy**

10             *Defendant's Argument*

11             MMC argues that Dr. Tonnemacher's declaration shows that Hoffman did not suffer

12  disparate treatment in her screening and received an appropriate screening under EMTALA.  Dr.

13  Tonnemacher testified that Hoffman received the same type of screening as any other patient in

14  Hoffman's position would have received.  Tonnemacher Deposition at 81:9-16; Tonnemacher

15  Declaration at ¶ 10.  Dr. Tonnemacher also declared that he is confident that the policies and

16  procedures in place at MMC on May 22, 2003, were "more than sufficient to comply with

17  EMTALA."  Tonnemacher Declaration at ¶ 11.  Further, the declaration of Penny Hastie

18  indicates that the hospital staff followed its practice guidelines and protocol guidelines.  See

19  Hastie Declaration at ¶¶ 7-9 & Exhibits B, C.[25]

20             *Plaintiff's Opposition*

21             Hoffman relies on PJF 1 and 4 to argue that summary judgment is inappropriate.  As

22  discussed above with PJF 1, Hoffman argues that Dr. Tonnemacher recognized that fever can be

23  associated with various emergency conditions including bacterial illness, that a reliable

24  temperature reading of 106˚ within six hours of a screening can raise concerns, and that a

25

26             [25]Exhibits B and C are the emergency department fever guidelines and triage policy.  In her deposition,
    Hastie indicated that these policies are intended for triage, which is not the same as a screening examination.  See
27  Hastie Deposition at 30-32.

28  daw                                        23

bacterial illness is a "potential concern" in a patient with Hoffman's history and a 102.3° fever.

PJF 4 states that Dr. Tonnemacher's screening did not follow MMC's EMTALA policy because he did not tailor his screening to the potential emergency condition, i.e. a bacterial process, that he himself had identified. This PJF is largely based on the deposition testimony of Penny Hastie, MMC's Rule 30(b)(6) representative regarding emergency room policies. To Hastie's knowledge, MMC has no specific policy regarding how emergency patients with suspected bacterial infections are supposed to be screened. Hastie Deposition at p. 14-15. However, Hastie testified that, pursuant to MMC's EMTALA compliance policy, a screening examination (1) is to be adapted to an individual patient's symptoms and course at the emergency room; and (2) must address the conditions that the examining physician believes are <u>possibilities</u> based on his initial exam, either to confirm that those conditions exist or to rule them out based on additional procedures. <u>Id.</u> at 29-30; <u>see also</u> Plaintiff's Opposition at 12:15-20.

*Resolution*

There is a disputed issue of material fact as to compliance with MMC's EMTALA policy. It is true that Dr. Tonnemacher testified that Hoffman received the same treatment as anyone else presenting with the same symptoms and history would have received. Tonnemacher Deposition at 82:9-16; Tonnemacher Declaration at ¶ 10. It is also true that Dr. Tonnemacher declared that he believed that "the policies and procedures in place at the [emergency department] of MMC were more than sufficient to comply with EMTALA." Tonnemacher Declaration at ¶ 11. However, Dr. Tonnemacher also testified that he has not seen any written policies, protocols, or procedures from MMC regarding EMTALA, and has not seen any information circulated by MMC regarding EMTALA. Tonnemacher Deposition at 48:19-22; 50:9-15.

More importantly, Penny Hastie gave the following testimony in her deposition:

**Q:     It indicates that a medical screening exam is a continuous process reflecting ongoing monitoring in accordance with an individual's needs. So basically a screening examination pursuant to [MMC's] policy is supposed to be adapted to an individual patient's symptoms and their course during the time that they are at the emergency room?**

1     A:     Correct.

2     **Q:     The next provision, I guess, I wanted to ask you about is on page 10 []. It**
      **indicates that an emergency medical condition possibly exists. If further**
3     **evaluation is necessary to determine whether the patient has an emergency**
      **medical condition. And then it goes on to talk about, you know, what**
4     **happens in that situation if the department doesn't have the resources**
      **necessary.**
5
      A:     Right.
6
      **Q:     So pursuant to [MMC]'s policy, a medical screening examination is supposed**
7     **to address the conditions that the examining physician believes are**
      **possibilities based on his initial exam?**
8
      A:     Correct.
9
      **Q:     Okay. And by address, I mean either confirm that those conditions exist or**
10    **rule them out based on additional procedures, is that right?**

11    A:     Yes.

12    Hastie Deposition at 29:9-30:10.

13         In his deposition, Dr. Tonnemacher testified:

14    **Q:     One of the prescriptions that you ordered for Ms. Hoffman upon her**
      **discharge was an antibiotic, correct?**
15
16    A:     Yes.

      **Q:     And did you prescribe an antibiotic because based on everything – based on**
17    **your course of treatment you had not been able to rule out a bacterial**
      **process?**
18
      A:     Yes.
19
20    Tonnemacher Deposition at 43:12-20.

21         Further, Dr. Tonnemacher recognized that fever can be associated with various

22    emergency conditions including bacterial illness and that a bacterial illness is a "potential

23    concern" in a patient with Hoffman's history and a 102.3˚ fever. Tonnemacher Deposition at

24    28:3-14; 37:16-38:2. Although Dr. Tonnemacher stated that a blood culture is not part of his

25    screening exam, e.g. Tonnemacher Deposition at 54:23-25, there is no discussion regarding

26    blood differentials, CBC's, or echocardiograms, and Dr. Bronston and Dr. Goldman opined that

27    these tests should have been given in either diagnosing or ruling out a bacterial process.

28

Bronston Declaration at ¶ 5; Goldman Declaration at ¶ 4.

Viewed in the light most favorable to Hoffman and making all reasonable inferences in her favor, see Stegall, 350 F.3d at 1065, a jury could find that MMC's EMTALA policy was not followed with respect to Hoffman.  A jury could find that the policy, as explained by Hastie, required Dr. Tonnemacher to confirm or rule out a bacterial process/infection and that Dr. Tonnemacher discharged Hoffman even though he had not ruled out a bacterial process.[26]  The declarations of Dr. Bronston and Dr. Goldman further indicate that additional tests could have been ordered, which raises the possibility that Dr. Tonnemacher could have done more or might have been able to confirm or rule out a bacterial process.  The failure to follow a hospital's EMTALA policy may be sufficient to support a finding of disparate treatment and thus, a finding that the hospital failed to provide an appropriate medical screening.  See Baker, 260 F.3d at 994; Battle v. Memorial Hosp., 228 F.3d 544, 558 (5th Cir. 2000); Repp, 43 F.3d at 522.  Summary judgment on Hoffman's disparate screening claim based on the failure to follow MMC's EMTALA policy is inappropriate.[27]


B.      **Failure To Stabilize An Emergency Medical Condition Prior To Discharge**

*Defendant's Argument*

MMC argues that it is entitled to summary judgment because no emergency condition was diagnosed by Dr. Tonnemacher.  Dr. Tonnemacher diagnosed and stabilized the only

---

[26]The Court cannot say that such a violation of MMC's EMTALA policy would be *de minimus* as a matter of law.  See Repp, 43 F.3d at 523.

[27]In resisting summary judgment, Hoffman relies on the deposition testimony of Penny Hastie, who was deposed in part on MMC's written EMTALA policy.  Prior to her deposition, MMC submitted a declaration by Hastie that included a copy of MMC's EMTALA policy, which is 23 pages.  Hastie Declaration Exhibit A.  Hoffman objects to consideration of Exhibit A because it was never disclosed by MMC during discovery.  MMC argues that Hoffman never asked for the EMTALA policy, so there was no need to disclose it.  Hoffman argues that it would be an abuse of discretion to grant summary judgment on the basis of Exhibit A.

The above quoted portions of Hastie's deposition are in reference to the EMTALA policy and MMC does not expressly cite to particular portions of the 23 page compliance policy.  Because the Court is not relying on Hastie's Exhibit A to grant summary judgment, it will refrain at this time from ruling on the issue of failure to disclose Hastie's Exhibit A.

daw                                  26

medical condition that he detected: bronchitis and possibly pneumonia.  Dr. Tonnemacher

concluded that this condition was stabilized in the emergency room and that discharge with an

antibiotic was appropriate.  Tonnemacher Declaration at ¶¶ 6, 10.  The duty to stabilize under

EMTALA requires actual awareness.  Because Dr. Tonnemacher treated and stabilized the only

condition of which he was actually aware, MMC did not violate the duty to stabilize.

### *Plaintiff's Opposition*

Hoffman relies on PJF 1 and 5 to argue that summary judgment is inappropriate.  PJF 5

appears to be based on:  medical records that show that Hoffman was discharged with a 102.5˚

fever and a pulse of 124, see Tonnemacher Declaration Exhibit A; Dr. Tonnemacher prescribed

antibiotics at discharge because he could not rule out a bacterial process, see Tonnemacher

Deposition at 43:12-20; the opinion of Plaintiff's expert Dr. Bronston that one had to assume that

Hoffman had a bacterial process and must admit her to the hospital, see Bronston Declaration at

¶ 5; and the opinion of plaintiff's expert Dr. Goldman that an emergency department physician

should have recognized that a patient with Hoffman's history and presentation could be suffering

from a bacterial infection, which required intravenous antibiotics and possible admission to the

hospital.  Goldman Declaration at ¶ 5.  Further, Dr. Tonnemacher testified that discharging a

patient with a known, uncontrolled, ongoing bacterial process would most likely constitute the

discharge of an unstable patient.  Tonnemacher Deposition at 66:17-25.

### *Discussion*

The key to the duty to stabilize is actual detection or knowledge of an emergency

condition.[28]  See Baker, 260 F.3d at 992-93; Jackson, 246 F.3d at 1257; Summers, 91 F.3d at

1140; Vickers, 78 F.3d at 145; Eberhardt, 62 F.3d at 1259.  That is, the hospital must determine

that an emergency medical condition exists. 42 U.S.C. § 1395dd(b); Eberhardt, 62 F.3d at 1259;

Gatewood, 933 F.2d at 1041.  Dr. Tonnemacher declared that, "My evaluation and workup, based

---

[28]Because actual detection or knowledge of a condition is the key for the duty to stabilize, PFJ Nos. 7 and 8
are irrelevant.  See Harris, 852 F.Supp. at 704.

on her history, my exam, and x-ray study more likely than not suggested a viral etiology to her

condition.  My diagnosis was fever and bronchitis with a differential diagnosis of possible

pneumonia." Tonnemacher Declaration at ¶ 6.  Further, Tonnemacher declared in pertinent part:

"I did not believe that [Hoffman] suffered from an emergency medical condition requiring further

immediate medical attention or any additional treatment prior to discharge," "It is my opinion

that [Hoffman] was not suffering from an emergency condition on May 22, either at the time of

presentation or at the time of discharge," and "[Hoffman] was discharged in a stable condition

with an appropriate antibiotic prescription and no additional medical screening or diagnostic

testing was indicated at that time."[29]  Id. at ¶¶ 6, 10.  Further, the discharge instructions that were

signed by Hoffman states that her diagnosis was bronchitis and describes that diagnosis.

Tonnemacher Exhibit A.

Dr. Tonnemacher's declaration does not show that he determined an emergency medical

condition existed, that is, it does not show actual detection or actual knowledge of an emergency

medical condition at the time of discharge.  The declarations of Dr. Bronston and Dr. Goldman

essentially require an assumption that a bacterial process was ongoing or that a diagnosis of

bacterial infection should have been made until disproved; they do not speak to Dr.

Tonnemacher's actual knowledge.  Dr. Tonnemacher's diagnosis was bronchitis, most likely

viral in nature.  It is true Dr. Tonnemacher testified that discharging a patient with a known,

uncontrolled, ongoing, serious bacterial process could constitute discharging an unstable patient.

Tonnemacher Deposition at 66:17-25.  Nevertheless, the evidence does not show that Dr.

Tonnemacher knew that Hoffman had an uncontrolled, ongoing, serious bacterial process when

he discharged her.[30]

---

[29]As previously mentioned, there is a disputed issue whether additional testing was "indicated" for Hoffman.

[30]Additionally, PJF 5 indicates that Hoffman's condition had not improved.  Hoffman does not provide specific citations to support this assertion, and it is contrary to Dr. Tonnemacher's declaration, see Tonnemacher Declaration at ¶ 7, and portions of the medical records, specifically under the "patient outcomes and discharge instructions" section where the box for "improved" is checked.  Tonnemacher Declaration Exhibit A.  Further, neither Dr. Bronston nor Dr. Goldman declared that Hoffman's condition had not improved at the time of discharge.

1    Dr. Tonnemacher did make a differential diagnosis of possible pneumonia[31] and testified

2    that he could not rule out a bacterial process. The Court has found only one EMTALA case

3    where a "differential diagnosis" was discussed. In *Harris*, a patient presented to the emergency

4    room, complained of severe left chest pain, was discharged, returned within two hours of

5    discharge in cardiac arrest, and died shortly thereafter. *Harris v. Health & Hosp. Corp.*, 852 F.

6    Supp. 701, 702 (S.D. Ind. 1994). The plaintiffs claimed that the hospital violated EMTALA's

7    stabilization provision. *Id.* at 703. The plaintiffs argued that, "There is no dispute that at the

8    time SHELIA was first examined by Dr. Severs at WISHARD she was suffering from an

9    emergency medical condition and that WISHARD knew this since Dr. Severs' differential

10   diagnosis included myocardial infarction and pulmonary embolus, both potentially fatal

11   conditions." *Id.* The district court rejected this argument:

12       In essence, Plaintiff attempts to persuade the Court that because myocardial
         infarction and pulmonary embolus were possible diagnoses, Wishard knew that
13       the Decedent was suffering from an emergency medical condition. The standard
         for the imposition of liability under the Act is not whether the hospital fails to
14       properly stabilize or transfer a patient after the hospital determines that the
         individual *potentially has* an emergency medical condition, it is whether it does so
15       after determining that the individual *has* an emergency medical condition. The
         Plaintiff has put no evidence before the Court indicating that Dr. Severs had
16       determined that on her first visit to the hospital on April 24, 1991, the Decedent
         was suffering from anything other than what he listed in the medical report as his
17       diagnosis: costochondritis and hyperventilation syndrome. The uncontroverted
         evidence indicates that his conclusion was that she was not suffering from an
18       emergency medical condition. *See* Affidavit of John Severs, M.D., at PP 4,5.
         Consistent with this belief, Dr. Severs listed her condition upon release as "stable"
19       and gave her a prescription for Ibuprofen. Whether in fact the Decedent was
         suffering from an emergency medical condition is irrelevant for purposes of the
20       Act. As is clear from the language of the statute, what matters is the hospital's
         determination of the patient's medical status. The standard is a subjective one.

21   *Id.* at 703-04 (emphasis added) (most citations omitted).

22       Here, as in *Harris*, there is no evidence that Dr. Tonnemacher actually knew that

23   Hoffman was suffering from an emergency medical condition or bacterial process at the time of

24

25

26       [31]"Pneumonia" is "inflammation of the lung parenchyma characterized by consolidation of the affected part,
     the alveolar air spaces being filled with exudate, inflammatory cells, and fibrin. Most cases are due to infection by
27   bacteria or viruses, a few to inhalation of chemicals or trauma to the chest wall, and a small minority to rickettsiae,
     fungi, and yeasts." Stedman's Medical Dictionary, 27 Ed., at p.1410.

28   daw                                          29

discharge.  See Harris, 852 F.Supp. at 704.  Dr. Tonnemacher believed that Hoffman's condition was most likely viral in nature and he made a diagnosis of bronchitis.  Tonnemacher Declaration at ¶ 6.  That he suspected pneumonia, that he could not rule out a bacterial process, or that he should have assumed a bacterial process is not the same as actual knowledge or determining that Hoffman had those conditions.  See Harris, 852 F.Supp. at 704.  In other words, Dr. Tonnemacher did not know and had not determined that Hoffman had an emergency medical condition.  See 42 U.S.C. § 1395dd(b); Eberhardt, 62 F.3d at 1259; Gatewood, 933 F.2d at 1041; Harris, 852 F.Supp. at 704.

Further, Hoffman's experts identify her emergency medical condition as a bacterial infection and offer criticisms on this basis.  They do not address Hoffman's condition in relation to Dr. Tonnemacher's diagnosis of bronchitis, likely viral in nature.  The duty to stabilize is determined in reference to the diagnosis, not in hindsight for what Hoffman "turned out to have." Vickers, 78 F.3d at 145.  There is no opinion offered regarding Hoffman's stability with regards to a diagnosis of bronchitis that is likely viral in nature.

Because Hoffman has not presented evidence that, at the time of discharge, Hoffman was unstable in relation to a diagnosis of likely viral bronchitis, or that Dr. Tonnemacher had determined that an emergency medical condition existed, that is that he had actual knowledge or actual detection of an emergency medical condition, summary judgment in favor of MMC on the stabilization claim is appropriate.  See 42 U.S.C. § 1395dd(b); Baker, 260 F.3d at 992-93; Jackson, 246 F.3d at 1257; Summers, 91 F.3d at 1140; Vickers, 78 F.3d at 145; Eberhardt, 62 F.3d at 1259; Gatewood, 933 F.2d at 1041; Harris, 852 F.Supp. at 703-04.

## CONCLUSION

Hoffman seeks recovery under both EMTALA's duty to render an "appropriate medical screening" and duty to stabilize.

With respect to the duty to render an "appropriate medical screening," Hoffman's argument that the screening was not designed to detect an emergency medical condition, and thus

1   was inappropriate, is not persuasive. This argument is based on the declarations of Dr. Bronston

2   and Dr. Goldman. However, these declarations equate an appropriate medical screening with

3   treatment that is appropriate under the applicable standard of care. These are criticisms of Dr.

4   Tonnemacher's diagnosis and medical judgment, which is the realm of negligence and not the

5   realm of EMTALA. EMTALA is not a medical malpractice statute and does not establish a

6   standard of care. The declarations also do not state that Dr. Tonnemacher's screening was not

7   designed to detect an emergency medical conditions and do not address the x-ray and urinalysis

8   that were ordered and relied upon. Because the criticisms by Dr. Goldman and Dr. Bronston are

9   medical malpractice criticisms, they do not show a violation of EMTALA. Summary judgment

10  in favor of MMC is appropriate on this theory of inappropriate screening.

11          With respect to Hoffman's claim of an inappropriate screening based on disparate

12  treatment, Hoffman attempts to show disparate treatment in relation to six other patients treated

13  by Dr. Tonnemacher and in relation to MMC's EMTALA policies. As to the six other patients

14  treated by Dr. Tonnemacher, Dr. Tonnemacher's deposition establishes that those six patients

15  had different, dispositive symptoms than Hoffman. EMTALA does not require the same

16  treatment of patients who have different symptoms. Because Hoffman was not actually

17  "similarly situated" to the six other patients, there is no disparate treatment.

18          However, as to Hoffman's claim of disparate treatment based on the failure to follow

19  MMC's EMTALA policy, a genuine issue of material fact exists. According to MMC's

20  representative, MMC's EMTALA policy requires a physician to confirm or rule out conditions

21  that he suspects a patient may have. Dr. Tonnemacher testified that he discharged Hoffman with

22  an antibiotic because he had not been able to rule out a bacterial process. In other words, Dr.

23  Tonnemacher did not rule out a bacterial process, even though a bacterial process was a concern.

24  Viewed in the light most favorable to Hoffman and making all reasonable inferences in her favor,

25  it is possible for a jury to conclude that Hoffman received disparate treatment in that Dr.

26  Tonnemacher did not follow MMC's policy. Summary judgment is inappropriate on this claim.

27          Finally, with respect to Hoffman's stabilization claim, at most Hoffman has shown that

28

Dr. Tonnemacher suspected pneumonia or a bacterial process.  However, the uncontroverted evidence shows that Dr. Tonnemacher believed that Hoffman had bronchitis, most likely viral in etiology, and that she was not suffering from an emergency condition at the time of discharge. Hoffman had the burden of showing actual detection or knowledge, and she has not done so.  At most, Hoffman has shown a potential condition.  Additionally, Hoffman has not offered testimony that Hoffman was unstable in relation to the diagnosis made.  Accordingly, summary judgment on Hoffman's stabilization claim is appropriate.

Accordingly, IT IS HEREBY ORDERED that:

1.    MMC's motion for partial summary on Plaintiff's EMTALA inappropriate screening claim based on the theory that her screening was not reasonably calculated to determine the existence of an emergency condition is GRANTED;

2.    MMC's motion for partial summary on Plaintiff's EMTALA inappropriate screening claim based on disparate treatment in relation to other patients treated by Dr. Tonnemacher is GRANTED;

3.    MMC's motion for partial summary on Plaintiff's EMTALA inappropriate screening claim based on disparate treatment in relation to MMC's EMTALA policy is DENIED; and

4.     MMC's motion for partial summary on Plaintiff's EMTALA failure to stabilize claim is GRANTED.

IT IS SO ORDERED.

**Dated:    March 31, 2006**                    **/s/ Anthony W. Ishii**
0m8i78                                               UNITED STATES DISTRICT JUDGE

daw                                          32