1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DONNA HOFFMAN, | ) | CIV F 04-5714 AWI DLB |
| | ) | |
| **Plaintiff**, | ) | ORDER ON DEFENDANT |
| v. | ) | MEMORIAL MEDICAL |
| | ) | CENTER'S SECOND MOTION |
| KENT TONNEMACHER, M.D.; | ) | FOR SUMMARY JUDGMENT |
| UNKNOWN PHYSICIANS; | ) | |
| MEMORIAL MEDICAL CENTER, | ) | (Document No. 205) |
| | ) | |
| **Defendants.** | ) | |

18    This case arises out of the May 22, 2003, visit by Plaintiff Donna Hoffman ("Hoffman")

19  to the emergency department of Defendant Memorial Medical Center ("MMC") where she was

20  seen by Dr. Kent Tonnemacher.  Dr. Tonnemacher diagnosed Hoffman as having bronchitis with

21  a differential diagnosis of pneumonia and discharged her with antibiotics the same day.  On May

22  23, 2003, Hoffman returned to MMC in an ambulance and went into septic shock.  After a

23  lengthy and difficult hospitalization with many complications, Hoffman survived her sepsis and

24  was released.  On May 14, 2004, she brought suit against MMC and Dr. Tonnemacher for

25  violations 42 U.S.C. § 1395dd (the Emergency Medical Treatment and Active Labor Act

26  ("EMTALA")), and California law medical malpractice.  Partial summary judgment was granted

27  to MMC on two of Hoffman's inadequate screening theories and her failure to stabilize theory,

28  Dr. Tonnemacher settled with Hoffman, and the case proceeded to trial.  The jury was unable to

1  reach a decision on any issue and the Court declared a mistrial.  In post trial motions, the Court

2  allowed MMC to designate an infectious diseases/causation expert (Dr. Lory Wiviott), and, based

3  on concerns the Court had regarding causation testimony at trial, allowed MMC to file a motion

4  for summary judgment on the issue of causation.  The prior summary judgment motion did not

5  deal with causation.  MMC filed the second motion for summary judgment, which is now before

6  the Court.  For the reasons that follow, MMC's motion will be granted.

7

8                            **FACTUAL BACKGROUND**[1]

9         Hoffman retained Dr. Peggy Goldman as an expert witness in the area of emergency

10  medicine and infectious diseases.  DUMF No. 1.  She formed opinions regarding the adequacy

11  and propriety of any emergency examination and treatment Hoffman received at MMC on May

12  22, 2003, and the causal relationship between Hoffman's emergency examination and treatment

13  and her subsequent medical course.  Id.  Specifically, Dr. Goldman's opinions concentrate on

14  how an EMTALA compliant emergency treatment would have impacted plaintiff's subsequent

15  medical course.  Id.  Based upon Dr. Goldman's review and consideration of the case materials in

16  this action, it was her opinion that, if MMC's EMTALA policy required Dr. Tonnemacher to rule

17  in or rule out a suspected bacterial infection, then EMTALA was violated since an appropriate

18  EMTALA screening had to include a complete blood count ("CBC"), blood differential,

19  sedimentation rate, blood culture, and an echocardiogram.  See DUMF Nos. 2, 6; Goldman

20  December Declaration at ¶ 4; Goldman Trial Testimony at 45-47.  Dr. Goldman also indicated

21  that administration of prophylactic antibiotics was part of a screening exam and "in a sense" a

22  screening tool.  Id. at 65, 91-92.  Although the echocardiogram was required to rule out the

23  possibility of endocarditis, Hoffman did not have endocarditis.  DUMF Nos. 3-4.

24

25         [1]"DUMF" refers to Defendant MMC's Undisputed Material Fact.  Additionally, Plaintiff's response to

26  MMC's submitted undisputed facts are generally the same.  Plaintiff responds nearly each time that MMC's facts are
    partial and misleading synopses of Dr. Goldman's opinions and that Dr. Goldman's opinions are fully and accurately

27  set out in "Section I" of the response.  See Court's Docket Doc. No. 204.  However, the response is not specific and
    leaves the Court to guess at why Plaintiff thinks that the proposed fact is misleading.  The Court will review Section I

28  and the specific testimony cited, but to the extent that the Court utilizes a DUMF it is because the Court does not find
    the DUMF to be misleading.

1    Hoffman contends that Dr. Tonnemacher's screening did not follow MMC's EMTALA

2   policy because he did not tailor his screening to the potential emergency condition of a bacterial

3   infection and did not confirm or rule out this condition based on additional procedures.  DUMF

4   No. 5.[2]  Penny Hastie's testimony indicates that MMC's EMTALA policy requires a physician to

5   either rule in or rule out an emergency medical condition.[3]  See Hastie Deposition at 29-30.  In a

6   declaration submitted as part of MMC's first summary judgment motion, Dr. Tonnemacher

7   declared that his diagnosis was bronchitis of viral etiology and a differential diagnosis of

8   pneumonia.  See Court's Docket Doc. No. 41 at ¶ 6.  Dr. Tonnemacher testified at his deposition

9   that he prescribed an antibiotic because he had not been able to rule out a bacterial process.  See

10  Tonnemacher Deposition at 43:12-20.  Dr. Goldman was of the opinion that Hoffman had a

11  bacterial infection and was in early sepsis on May 22, 2003, when she was examined by Dr.

12  Tonnemacher.  See Goldman Trial Testimony at 63; see also DUMF No. 7.  Dr. Goldman

13  testified that Hoffman had bacteria (streptococcus pneumonia) in her bloodstream which caused

14  sepsis and septic shock.  See Goldman Trial Testimony at 49-50.

15    At trial, Dr. Goldman testified that the following tests could have helped Dr.

16  Tonnemacher to rule in or rule out a bacterial infection:  blood sedimentation rate, urinalysis,

17  ultrasound,[4] CAT or CT scan, x-rays, a complete blood count ("CBC"), and blood culture.  See

18  Goldman Trial Testimony at 26-34.  Of these tests, Dr. Tonnemacher ordered only an x-ray and

19  urinalysis.  See id. at 33.

20    With respect to CT or CAT scans, Dr. Goldman testified that CT scans usually give more

21  information than a regular x-ray in that a CT scan can give a three dimensional view and is not

22  limited to only black and white images.  See id. at 30-31.  Dr. Goldman testified that CT scans

23

24    [2]Plaintiff states that this is a misleading synopsis of Dr. Goldman's opinions.  However, DUMF No. 5 does
    not mention Dr. Goldman and instead purports to be based on Plaintiff's opposition to MMC's first summary

25  judgment motion.  Since the DUMF is not based on Dr. Goldman, Plaintiff has not adequately disputed this DUMF.

26    [3]For this motion, the Court assumes without deciding that MMC's EMATAL policy requires a physician to
    either rule in or rule out a suspected serious medical condition.

27    [4]In opposition, Hoffman relies on the failure to administer a CBC, blood sedimentation, CT scan, blood

28  culture, and intravenous antibiotics and early goal directed therapy.  See Plaintiff's Opposition at 24:2-6; Plaintiff's
    Response to DUMF Nos. 8-13.  As such, the Court will not consider the administration of an ultrasound.

can help to determine if there is an infection in the head, chest, or abdomen.  See id. at 27.  For example, if an infection is present in the lungs or if an abscess is present in the stomach, then the CT scan can reveal the infection in those organs.  See id. at 30.

With respect to blood cultures, Dr. Goldman testified that blood cultures are used by emergency medicine practitioners to rule in or rule out bacterial infections.  See id. at 31-32.  Dr. Goldman testified that blood cultures are the definitive or "final word" for bacterial infections, will show what bacteria is in the bloodstream and affecting the body, and will show what antibiotics are effective against the bacteria.  See id. at 32.  If a blood culture shows that there is bacteria in the blood, but the patient has already left, the patient can be called back to the emergency room.  See id.  A blood culture is the only screening tool available in the emergency department for ruling out bacteria in the bloodstream.  See Goldman Deposition at 52-53; see also DUMF No. 9.  Blood cultures usually yield results in about 48 hours, but results can occur more quickly if there is a greater amount of bacteria in the bloodstream.  See Goldman Trial Testimony at 51.  A blood culture was performed on Hoffman on May 23 and the results came back in approximately 10 hours.  See id.; see also DUMF No. 11.

With respect to blood sedimentation rate, Dr. Goldman explained:

> The sed rate is a general test.  It . . . is an indirect measure of inflammatory proteins in the blood that get released when there's a stress on the body.  And a bacterial infection is a stress on the body.  So if the sedimentation rate is elevated, it can help to pick out which people have a serious problem versus those who might just be complaining and not have a serious problem.

Id. at 29-30.  The results of the blood sedimentation rate would have been available in about an hour.  See id. at 30.

Dr. Goldman testified that giving intravenous antibiotics is, to some extent, a diagnostic tool because one can see whether the patient improves with the antibiotic or not, which helps to make a diagnosis.  See id. at 92.  Dr. Goldman testified that the physician is not actually treating a bacterial infection because it is unknown if one exists, rather, the physician is using the antibiotic to rule out or forestall against a life threatening bacterial infection.  See id.

According to Dr. Goldman, a CBC measures white blood cells.  See id. at 28.  If a person has a serious bacterial infection, the total number of white blood cells will be increased, the

4

number of segmented nutrafils will be increased, and the number of immature segmented nutrafils will be increased.  Id.  Dr. Goldman testified that an elevation in these three aspects of the CBC "can be useful" in determining whether there is a possible bacterial infection.  See id. at 29.

When explaining how an x-ray and urinalysis do not completely rule in or rule out the existence of a bacterial infection, Dr. Goldman explained:

> Well, there still could be a bacteria in the blood and if the chest x-ray is normal, that doesn't really relate to a bacteria in the blood.  So it really hasn't looked at that possibility.  And the CBC and the sed rate[5] would lead to – if those results are abnormal, would lead to possibly other tests looking at where bacteria might be in the person.

Id. at 34; see also DUMF Nos. 9-10.  Thus, with the exception of the blood culture, the other blood tests lacked specificity.  See DUMF No. 10.  Blood cell counts can be elevated in many medical conditions other than sepsis.  See id.  Results of white blood cell counts and differentials are not reported as simply "positive" or "negative," but are qualitative measures representing a broad continuum of possible results, some mild and not alarming, and others more significant. See id.  There is no single CBC result that independently warrants exact treatment.  See id.

 Dr. Goldman was of the opinion that had an appropriate screening been done and Hoffman received prophylactic therapy, her early sepsis would not have developed into SIRS (systemic inflammatory response syndrome).  DUMF No. 8; Goldman Trial Testimony at 72.  In this case, the delay between May 22 and May 23 was significant because Hoffman went from having early sepsis, to developing septic shock, to developing SIRS and related SIRS sequelae. See Goldman Trial Testimony at 63.  According to Dr. Goldman, an accepted way to treat early sepsis in the emergency department is to obtain blood cultures and, although the results are not available, start performing early intervention therapy or "prophylactic therapy" or early goal directed therapy consisting of intravenous fluids and antibiotics.  DUMF No. 12; see also

---

[5]The Mayo Clinic's website states, a blood sedimentation rate "measures the speed at which red blood cells settle to the bottom of a glass tube.  The presence of certain abnormal proteins in the blood can cause red blood cells to stick together and sink to the bottom more quickly."  http://www.mayoclinic.com/health/sed-rate/HO00025. Consistent with Dr. Goldman's testimony, the Mayo Clinic indicates that an elevated sedimentation is not specific to any condition, can be caused by many things including such things as infection and cancer, may indicate an underlying problem, but further testing is needed to identify the cause of the problem.  Id.; see also DUMF No. 10.

Goldman Trial Testimony at 68-70.

Dr. Goldman opined that an EMTALA compliant screening would have resulted in the administration of early goal directed therapy on May 22, 2003. June 2 *In Camera* Goldman Testimony at 5.   Early goal directed therapy attempts to maximize the body's delivery of oxygen to its tissues so that the tissues survive. See June 2 *In Camera* Goldman Testimony at 6. The primary parts of early goal directed therapy are provision of drugs and fluids, monitoring blood pressure and profusion, and providing antibiotics. See id. Early goal directed therapy, however, is more than just the provision of antibiotics. See Goldman Trial Testimony at 94. In Dr. Goldman's opinion, prophylactic or early intervention therapy administered at the emergency department on May 22 would have prevented SIRS and its sequelae from developing; in other words, Hoffman's medical outcome would have changed and her entire clinical course would have been avoided. See DUMF Nos. 13-14. Early goal directed therapy must be commenced within 6 hours of the presenting symptoms for a patient's medical outcome to have been better. See DUMF No. 15. In this case, the 6 hour window to successfully commence early goal directed therapy began about the time Hoffman came in and saw Dr. Tonnemacher on May 22. DUMF No. 16.

In a study published in the New England Journal of Medicine, relied upon by Dr. Goldman, it was observed that the utilization of early goal-directed therapy, which is a combination of aggressive treatments within the first 6 hours after admission, reversed the effects of septic shock and reduced mortality rates in severe septic patients from 46.5% to 30% and also resulted in significantly decreased morbidity. DUMF No. 17. It was, therefore, Dr. Goldman's opinion that, since early goal-directed therapy has a significant effect on the mortality and morbidity of even severely septic or septic shock patients, the utilization of such therapy for a bacteremic or early septic patient would likely prevent SIRS from developing. DUMF No. 18. Dr. Goldman is of the opinion that the difference in outcome would be "better" for patients with early sepsis who receive early goal directed therapy. DUMF No. 19. However, Dr. Goldman does not know, in terms of percentages, how much better the relative proportions would be for patients with early sepsis who are administered goal directed therapy. DUMF No. 20.

1   According to Dr. Goldman, there is no exact percentage, but it would be better than the 30% for

2   early sepsis patients receiving early goal directed therapy.  DUMF No. 21.  With regard to

3   patients who have mild sepsis but are not given early goal-directed therapy, it was Dr. Goldman's

4   opinion that 46% or less of such patients will go on to develop severe sepsis.  DUMF No. 22.

5   Purpura fulminans is one of the sequelae of SIRS and typically manifests when sepsis has

6   become severe or developed into septic shock, and even then only develops in a relatively small

7   number (3% or less) of such patients.  See DUMF No. 23; MMC Exhibit F at ¶ 4.  Dr.

8   Goldman's estimate is that the incidence of developing purpura fulminans, if in the early stages

9   of sepsis, would hopefully get below 3%.  DUMF No. 24.  However, if SIRS never takes hold,

10  then its clinical manifestations, including purpura fulminans, do not occur.  June 2 *In*

11  *Camera* Goldman Testimony at 11.  Dr. Goldman testified that if Hoffman had received early

12  goal directed therapy during her May 22 presentation, more likely than not, the SIRS process

13  would not have taken hold.  See Goldman Trial Testimony at 70.

14

15                                **SUMMARY JUDGMENT FRAMEWORK**

16          Summary judgment is appropriate when it is demonstrated that there exists no genuine

17  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

18  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

19  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755

20  F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

21  undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-

22  Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

23  case turns on a mixed question of law and fact and the only dispute relates to the legal

24  significance of the undisputed facts, the controversy for trial collapses into a question of law that

25  is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d

26  1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

27          Under summary judgment practice, the moving party always bears the initial
            responsibility of informing the district court of the basis for its motion, and
28          identifying those portions of "the pleadings, depositions, answers to

                                                7

interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).

1    If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material

2    fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at

3    1103.

4           In attempting to establish the existence of a factual dispute, the opposing party may not

5    rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

6    specific facts in the form of affidavits, and/or admissible discovery material, in support of its

7    contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

8    391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001).  However,

9    the opposing party need not establish a material issue of fact conclusively in its favor.  It is

10   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

11   parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; Hopper v. City

12   of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to

13   'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

14   trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 132 (9th

15   Cir. 1982).

16          The court has the discretion in appropriate circumstances to consider materials that are

17   not properly brought to its attention, but the court is not required to examine the entire file for

18   evidence establishing a genuine issue of material fact where the evidence is not set forth in the

19   opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336

20   F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031

21   (9th Cir. 2001).  The evidence of the opposing party is to be believed, and all reasonable

22   inferences that may be drawn from the facts placed before the court must be drawn in favor of the

23   opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel

24   Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of

25   the air, and it is the opposing party's obligation to produce a factual predicate from which the

26   inference may be drawn.  See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal.

27   2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine

28   issue of material fact does not spring into being simply because a litigant claims that one exist or

9

1  promises to produce admissible evidence at trial." <u>Del Carmen Guadalupe v. Agosto</u>, 299 F.3d

2  15, 23 (1st Cir. 2002); <u>see</u> <u>Galen v. County of Los Angeles</u>, 477 F.3d 652, 658 (9th Cir. 2007);

3  <u>Bryant v. Adventist Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir. 2002).

4

5                                    **MMC'S MOTION**

6      *MMC's Argument*

7          MMC argues that it is entitled to summary judgment because Hoffman cannot establish

8  that her injuries were a direct result of an EMTALA violation.  Hoffman's theory is that the

9  administration of certain tests would have allowed Dr. Tonnemacher to rule in a bacterial

10 infection, which would have lead him to administer early goal directed therapy, which would

11 have prevented SIRS and all sequelae from manifesting.  However, only a blood culture could

12 rule in the bacterial infection that was afflicting Hoffman and the other blood tests were non-

13 specific.  Hoffman only had a 6 hour window in which Dr. Tonnemacher could have instituted

14 early goal directed therapy.  The evidence shows that the results of the blood culture would not

15 have been available until after 6 hours.  Despite Hoffman's argument, administering prophylactic

16 antibiotics or beginning early goal directed therapy prophylactically is not part of a medical

17 screening, rather it is treatment.  Since the results of the only test that would have ruled in or

18 ruled out the bacterial infection would not have been available within 6 hours, Hoffman cannot

19 show that her injuries were a direct result of the failure to follow MMC's EMTALA policy.

20         Finally, with respect purpura fulminans and other sequelae of SIRS, Dr. Goldman opined

21 that about 30% of those patients who received early goal directed therapy developed severe

22 sepsis, while about 46% of those patients who did not receive early goal directed therapy

23 developed severe sepsis.  This 16% chance of a better result is insufficient as a matter of law to

24 Hoffman sustaining her burden on specific causation.

25      <u>*Plaintiff's Opposition*</u>

26         Hoffman argues that the facts viewed in the light most favorable to her show that there

27 are myriad disputed material facts.  After summarizing the various forms of testimony from Dr.

28 Goldman, Dr. Wiviott, Dr. Tonnemacher, and Penny Hastie, Hoffman argues that the evidence

1   would permit a jury to find that the failure to administer a CBC, blood sedimentation, CT scan,

2   blood culture, prophylactic intravenous antibiotics, and early goal directed therapy was a

3   substantial factor in the development of plaintiff's full blown sepsis and SIRS, including the

4   permanent injuries sustained.  Dr. Goldman testified that the administration of antibiotics and

5   early goal directed therapy was part of the screening process warranted by the possible bacterial

6   infection perceived by Dr. Tonnemacher.  The administration of the antibiotics and instigation of

7   early goal directed therapy was not merely treatment.  Further, MMC is misleadingly arguing that

8   treatment would have been delayed until blood culture results were available.

9        Further, MMC mischaracterizes a portion of Dr. Goldman's testimony regarding the

10  likelihood of a different result.  The portion relied on by MMC is a section in which Dr.

11  Goldman was talking about patients with full blown sepsis and not patients like Hoffman, who

12  had early sepsis when she saw Dr. Tonnemacher.  Even Dr. Wiviott could not say whether early

13  goal directed therapy administered during the May 22 admission would have changed the clinical

14  course and could not say when Hoffman's course became inalterable.

15  *Legal Standard – EMTALA*

16       "EMTALA imposes two duties on hospital emergency rooms: a duty to screen a patient

17  for an emergency medical condition, and, once an emergency condition is found, a duty to

18  stabilize the patient before transferring or discharging him."  Baker v. Adventist Health, Inc., 260

19  F.3d 987, 992 (9th Cir. 2001); see 42 U.S.C. § 1395dd(a), (b).  A hospital meets its obligation to

20  provide an "appropriate medical screening" under EMTALA when it:

21       provides a patient with an examination comparable to the one offered to other
        patients presenting similar symptoms, unless the examination is so cursory that it
22      is not designed to identify acute and severe symptoms that alert the physician of
        the need for immediate medical attention to prevent serious bodily injury.
23

24  Baker, 260 F.3d at 995; Jackson v. East Bay Hospital, 246 F.3d 1248, 1256 (9th Cir. 2001);

25  Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258-59 (9th Cir. 1995); see also Correa v.

26  Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995).  "The essence of this requirement is

27  that there be some screening procedure, and that it be administered even-handedly."  Correa, 69

28  F.3d at 1192.  EMTALA does not require hospitals to provide identical screening to patients

11

1  presenting with different symptoms and does not require hospitals to provide screenings that are

2  beyond their capabilities.  Baker, 260 F.3d at 995.

3        Conversely, a failure to provide any screening, the provision of a "cursory screening" that

4  amounts to no screening at all in that it is not designed to detect acute and severe symptoms, and

5  disparate treatment such as the hospital's failure to follow its own screening procedures, may all

6  constitute a breach of the hospital's duty to provide an appropriate medical screening to a patient

7  seeking emergency treatment.  See 42 U.S.C. § 1395dd(a); Bryant, 289 F.3d at 1166; Baker, 260

8  F.3d at 994-95; Jackson, 246 F.3d at 1256; Correa, 69 F.3d at 1192-93; Eberhardt, 62 F.3d at

9  1258-59.  However, negligence in the screening process or the provision of a merely faulty

10  screening, as opposed to refusing to screen or disparate screening, does not violate EMTALA,

11  although it may implicate state malpractice law; that is, negligent medical treatment is not the

12  same as a disparate screening under EMTALA.  See Del Carmen Guadalupe v. Agosto, 299 F.3d

13  15, 21 (1st Cir. 2002); Reynolds v. Mainegeneral Health, 218 F.3d 78, 84 (1st Cir. 2000);

14  Marshall v. East Carroll Parish Hosp. Serv., 134 F.3d 319, 323-24 (5th Cir. 1998); Vickers v.

15  Nash Gen. Hosp., 78 F.3d 139, 143 (4th Cir. 1994); Correa, 69 F.3d at 1192-93; see also

16  Jackson, 246 F.3d at 1255-56. A hospital "does not violate EMTALA if it fails to detect or

17  misdiagnoses an emergency condition," and the remedy of a person so injured is through a state

18  law medical malpractice claim.  Bryant, 289 F.3d at 1165; Baker, 260 F.3d at 993.

19        "Any individual who suffers personal harm as a direct result of a participating hospital's

20  violation of a requirement of [EMTALA] may, in a civil action against the participating hospital,

21  obtain those damages available for personal injury under the law of the State in which the

22  hospital is located, and such equitable relief as is appropriate."  42 USCS § 1395dd(d)(2)(A);

23  Vargas by & Through Gallardo v. Del Puerto Hosp., 98 F.3d 1202, 1205 (9th Cir. 1996).

24        *Discussion*

25        On the first summary judgment motion, Penny Hastie's testimony created a triable issue

26  of fact concerning MMC's EMTALA policy.  See Court's Docket Doc. No. 59 at p. 26.  Hastie's

27  testimony indicated that MMC's policy required a physician to rule in or rule out an emergency

28  medical condition.  See id.  Under section 1395dd(d)(2)(A) of EMTALA, Hoffman may recover

1   California personal injury damages for the harm that she suffered as a direct result of Dr.

2   Tonnemacher failing to follow MMC's EMTALA policy; that is, harm that was a direct result of

3   Dr. Tonnemacher failing to rule in or rule out the bacterial infection that was afflicting Hoffman.

4   See 42 USCS § 1395dd(d)(2)(A); Vargas, 98 F.3d at 1205.

5          The harm that was suffered by Hoffman appears to have stemmed entirely from the

6   development of sepsis into SIRS, and the very difficult complications that flow from SIRS.  Dr.

7   Goldman has opined that, although Hoffman was in early sepsis when she presented, the

8   administration of early goal directed therapy during Hoffman's May 22 presentation would have

9   more likely than not prevented the development of SIRS and the associated sequelae.  However,

10  the window within which to administer early goal directed therapy is relatively narrow: it had to

11  be administered to Hoffman within 6 hours of her presentation.  Given this time frame, the

12  evidence needs to support the theory that had Dr. Tonnemacher employed further screening tools

13  and identified or ruled in a bacterial infection, and in particular the bacterial infection in

14  Hoffman's bloodstream, he would have then administered early goal directed therapy within 6

15  hours of Hoffman's presentation.

16         When Dr. Tonnemacher saw Hoffman, he ordered an x-ray and a urinalysis.  According

17  to Hoffman, in order to comply with MMC's EMTALA policy of ruling in or ruling out a

18  bacterial infection, Dr. Tonnemacher should have also ordered a CT scan, a CBC, a blood

19  sedimentation rate, a blood culture, and administered prophylactic antibiotics and early goal

20  directed therapy.  In the hearing outside the presence of the jury, Dr. Goldman stated that an

21  EMTALA compliant screening would have resulted in the administration of early goal directed

22  therapy.  However, Dr. Goldman's trial testimony indicates that, of the screening tools available

23  to Dr. Tonnemacher, none would have identified/ruled in or ruled out Hoffman's bacterial

24  infection until after the 6 hour window for administering early goal directed therapy had expired.

25         Dr. Goldman's explanation of the CT scan does not indicate that this test would have

26  ruled in or ruled out Hoffman's bacterial infection.  Dr. Goldman's testimony indicates that this

27  test is a more detailed version of an x-ray.  See Goldman Trial Testimony at 30-31.  There is no

28  discussion regarding the time it likely would take to administer the test and have the results

13

interpreted.  More importantly, the testimony does not indicate that a CT scan would have been able to detect or identify the bacterial infection that was in Hoffman's bloodstream.  Cf. Goldman Trial Testimony at 34; Goldman Deposition at 52-53.  There is no explanation of how the results of the CT scan would have led Dr. Tonnemacher to identify/rule in or rule out Hoffman's bacterial infection and begin early goal directed therapy.

With respect to the CBC, Dr. Wiviott's uncontradicted declaration indicates that numerous conditions can cause an increase in white blood cells, including the absence of a spleen.[6]  See Wiviott Declaration at ¶ 14.  Dr. Goldman's testimony indicated that the results of a CBC would lead to the administration of other tests.  See Goldman Trial Testimony at 34.  Also, Dr. Wiviott's testimony is uncontradicted that the results of the CBC tests alone would not have justified the administration of early goal directed therapy.  See Wiviott Declaration at ¶ 14.  Similarly, Dr. Goldman's deposition testimony indicates that the CBC would not have identified or ruled out the bacteria in Hoffman's bloodstream.  See Goldman Deposition at 52-53. Given the non-specific nature of a CBC, the Court can only conclude that, at best, the results of the CBC would have led to the administration of other tests, that is, it would have simply continued the screening process.[7]  It would not have identified/ruled in or ruled out the bacterial infection in Hoffman's bloodstream.

The same is true of the blood sedimentation rate.  In fact, the description of the blood sedimentation rate indicates that it is merely an indirect measure of the level of stress on the body.  See Goldman Trial Testimony at 29-30.  There is no testimony regarding what conditions can cause an increased blood sedimentation rate.  There is also no testimony regarding how knowing that the body is under stress would have allowed Dr. Tonnemacher to identify/rule in the bacterial infection in Hoffman's bloodstream and caused him to administer early goal directed therapy.  In fact, Dr. Goldman's deposition testimony indicates that the blood sedimentation rate would not have identified or ruled out the bacteria in Hoffman's bloodstream.

[6]Hoffman sometime previously had a splenectomy.

[7]Additionally, there is no testimony regarding what the results of this test likely would have been.

14

1    See Goldman Deposition at 52-53.  Like the CBC, the evidence merely suggests that other tests

2    would have been necessary for Dr. Tonnemacher to either rule in or rule out the bacterial

3    infection in Hoffman's bloodstream.[8]  See Goldman Trial Testimony at 34.  That is, at best, the

4    blood sedimentation rate would have continued the screening process.

5        The only test that would have actually identified and ruled in the bacterial infection in

6    Hoffman's bloodstream was the blood culture.  Dr. Goldman testified that this is the definitive

7    test and it is the only test available to emergency department physicians to identify or rule out an

8    infection in the blood stream.  See Goldman Trial Testimony at 32; Goldman Deposition at 52-

9    53.  The problem is that, despite the valuable information that a blood culture yields, it is a slow

10    developing test.  Dr. Goldman testified that the average blood culture takes about 48 hours before

11    results are available.  See Goldman Trial Testimony at 51.  Hoffman did have a blood culture

12    done on May 23 and the results came back in 10 hours.  See id.  This indicates that there was a

13    relatively high amount of bacteria in Hoffman's bloodstream.  See id.  However, Hoffman's

14    condition had deteriorated from her May 22 presentation when she was seen by Dr.

15    Tonnemacher.  When Dr. Tonnemacher saw Hoffman on May 22, Dr. Goldman opined that

16    Hoffman was in early sepsis.  See id. at 63.  On May 23, when Hoffman was brought to the

17    emergency room via ambulance, her early sepsis had progressed and she was in septic shock with

18    SIRS.  See id.  Since the average blood culture takes 48 hours in which to complete, the results of

19    the May 23 blood culture came back in 10 hours, and Hoffman was in a better condition on May

20    22, there is no basis for thinking that if Dr. Tonnemacher had ordered a blood culture on May 22

21    that the results would have been available in 6 hours or less.  The testimony clearly indicates that

22    the results of a blood culture, that is the only test that would have allowed Dr. Tonnemacher to

23    definitively  rule in or rule out the bacterial infection in Hoffman's bloodstream, would not have

24    been available within the 6 hour window for the administration of early goal directed therapy.

25        To address this problem, Hoffman argues that the screening process would have included

26    administration of intravenous antibiotics and administration of early goal directed therapy.  That

27

28

---

[8]Additionally, there is no testimony regarding what the results of this test likely would have been.

1   is, Hoffman argues that had her early sepsis "been properly screened and identified, she would

2   have received early goal directed therapy."  Plaintiff's Opposition at 15:2-3.  Hoffman cites pages

3   69, 70, and 113 of Dr. Goldman's trial testimony in support of this proposition.  Page 113,

4   however, is the beginning of redirect examination and merely reiterates that the administration of

5   early goal directed therapy in the first 6 hours of presentation would have more likely than not

6   prevented SIRS from developing.  See Goldman Trial Testimony at 113.  Pages 69 and 70 deal

7   with the proper treatment of sepsis and describes the administration of early goal directed

8   therapy.  See id. at 68-70.[9]  What this testimony explains is how sepsis should be treated.  See id.

9   It is in response to a question about how sepsis is treated in the emergency department and

10  assumes that sepsis has been detected and diagnosed.  However, Dr. Tonnemacher never detected

11  or diagnosed sepsis, that is to say the bacterial infection in Hoffman's bloodstream.  Instead, he

12  diagnosed viral bronchitis with a differential diagnosis of pneumonia.  See Court's Docket Doc.

13  No. 41 at ¶ 6.  A misdiagnosis or a failure to properly diagnose is not a violation of EMTALA.

14  See Bryant, 289 F.3d at 1165; Baker, 260 F.3d at 993; Vickers, 78 F.3d at 142.  That Dr.

15  Tonnemacher did not recognize sepsis from Hoffman's symptoms is not within the purview of

16

17      [9]In relevant part, and retreating back to the last line of page 68 for context, pages 69-70 read:

18      Q:      With respect to early sepsis, is there, as part of emergency treatment an accepted way to
                address that condition?
19      A:      Yes.
        Q:      And what – how is that?
20      [Overruled objection omitted]
        A:      What you do is get blood cultures and have them working in the lab for you, even though the
21              results aren't back right away.  You state IV lines and start to give intravenous fluids and optimize
                the blood status of the patient, the cardiovascular status of the patient, and you give intravenous
22              antibiotics while you're waiting for your cultures to come back.  So that is the general way that you
                start to treat sepsis in the emergency department.
23      Q:      And is there a commonly accepted name for that combination of treatment? In terms of - -
        A:      It's in a sense ruling out the possibility of life threatening infection.  In other words, what we do is
24              we do the tests that are necessary, but we go ahead and treat anyway, even if we don't have total
                evidence for it yet, just in case because if we don't, we may miss the opportunity to cure the
25              person.
        Q:      Is that combination of treatment sometimes referred to as early intervention therapy?
26      A:      Yes.
        Q:      Okay.
27      A.      Or prophylactic therapy.

28  Id. at 68:25-70:3.

EMTALA.  Since Dr. Tonnemacher did not diagnose sepsis at the time of discharge, what is necessary is an explanation of the tests available to him and which tests would have identified or ruled in the bacteria in Hoffman's bloodstream, if Dr.Tonnemacher were to rule in or rule out a bacterial infection as dictated by MMC's EMTALA policy.  In other words, in following MMC's EMTALA policy, there needs to be testimony about which test results would have changed Dr. Tonnemacher's diagnosis from viral bronchitis to sepsis/bacterial infection in the bloodstream such that Dr. Tonnemacher would have then treated that condition with early goal directed therapy.  The evidence indicates that the only tool which would have definitively done so was the blood culture.  Unfortunately, the results of that test would not have been available within the 6 hour window in which to administer early goal directed therapy.

To the extent that Hoffman argues or Dr. Goldman suggests that the administration of intravenous antibiotics and the administration of early goal directed therapy or prophylactic therapy are themselves screening tools, the Court cannot agree.  Under EMTALA, a hospital meets its screening burden when it "provides a patient with an *examination* comparable to the one offered to other patients presenting similar symptoms, unless the *examination* is so cursory that it is not designed to *identify* acute and severe symptoms that alert the physician of the *need for immediate medical attention* to prevent serious bodily injury."  Baker, 260 F.3d at 995 (emphasis added); Jackson, 246 F.3d at 1256.  Screening is a form of examination, which would include the administration of tests, that is designed to identify symptoms/conditions and alert the physician for the need for medical attention, that is, medical treatment.  Cf. id.  Stated differently, screening is an examining process, it is not a treatment.

"Antibiotics" are soluble substances derived from a mold or bacterium that inhibits the growth of other microorganisms.  Stedman's Medical Dictionary at 96 (27th ed.); see also Merriam Webster On-Line Diction (Antibiotics are substances "produced or a semisynthetic substance derived from a microorganism and able in dilute solution to inhibit or kill another microorganism.").  Thus, antibiotics are given to patients by physicians in order inhibit or kill microorganisms, that is to treat a suspected or diagnosed medical condition.  Unlike a blood culture, for example, antibiotics do not identify serious medical conditions.  In fact, one of the

benefits of the blood culture is that it can determine which antibiotics will kill the bacteria, and once the blood culture results are back, the effective antibiotic may be given.  Similarly, in a non-psychological setting, "therapy" is "the treatment of a disease or disorder by any method."  Stedman's Medical Dictionary at 1821 (27th ed.).  Treating a disease or disorder is not identifying serious symptoms or conditions.  Instead, like "antibiotics," "therapy" is a reaction to a known or suspected medical condition that is designed to treat or change that condition.  Therefore, antibiotics and therapy are treatments that do not themselves identify symptoms or conditions.  For purposes of EMTALA, as a matter of law, the administration of antibiotics or particular "non-psychological" therapies are treatments of a medical condition, they are not screening tools.[10]

With respect to MMC's particular  EMTALA policy, that policy requires confirming or ruling out an emergency medical condition – it does not require that  prophylactic treatment or therapy be administered.  By definition, prophylactic treatment is protective treatment that is done before a condition is ruled in or ruled out.  The failure to provide prophylactic treatment is not a failure to screen or a disparate screening, it is at most negligence.

Accordingly, the evidence indicates that if Dr. Tonnemacher had followed MMC's EMTALA policy, the only test that would have actually identified and ruled in the bacterial infection in Hoffman's bloodstream would not have produced results until well after the 6 hour treatment window had closed.  Prophylactic treatment is not screening and it is not identifying or ruling in or ruling out a condition, it is treatment done prior to ruling in or ruling out a medical condition.  Since ruling in or ruling out the bacterial infection in Hoffman's bloodstream would have occurred well after 6 hours, there is a failure of causation.  In other words, Dr.

---

[10]Dr. Goldman testified that the administration of intravenous antibiotics is "to some extent" a screening tool because one can see if the patient "gets better with it or not;" the antibiotics are used "in a sense to rule out or forestall against a life threatening bacterial infection."  Goldman Trial Testimony at 92.  Forestalling a condition is conduct that inhibits or slows progression of a known or suspected condition.  Further, it is not clear that if a patient "gets better" that improvement would be due to antibiotics, especially if it is unknown what was actually afflicting the patient (the antibiotics may have worked or the body may have "healed itself").  An improving condition or the forestalling of a condition is not identifying the condition, it is simply treating the condition.  Even if used "prophylactically," the antibiotics are being used as a protective measure to treat a suspected condition.  Characterizing the administration of antibiotics as a screening tool instead of as a treatment is not reasonable and is not "screening" for purposes of EMTALA.

Tonnemacher's failure to rule in or rule out a bacterial infection as required by MMC's EMTALA policy during the May 22 presentation did not cause Hoffman harm.[11]

## **CONCLUSION**

Dr. Tonnemacher diagnosed viral bronchitis with a differential diagnosis of pneumonia. Assuming that MMC's EMTALA policy required Dr. Tonnemacher to rule in or rule out suspected serious medical conditions, the only test that would have definitively identified and ruled in the bacterial infection in Hoffman's bloodstream was the blood culture.

The CBC and sedimentation rate are general tests that are non-specific, at best their results would lead to the administration of other unspecified tests, it is unknown what the results of those tests would have been, and the results of those tests would not have identified the bacterial infection in Hoffman's bloodstream.  There is no evidence that the results of those tests would have caused Dr. Tonnemacher to administer early goal directed therapy.

With respect to the CT scan, it is unknown how long a CT scan would take, it does not appear that the bacterial infection in Hoffman's bloodstream would have been detected, and it is unknown how the results of the that test would have caused Dr. Tonnemacher to administer early goal directed therapy.

Blood cultures are the only tests available to emergency room physicians that can definitively rule in or rule out a bacterial infection in the bloodstream.  Thus, administering this test would have fulfilled MMC's EMTALA policy.

Administration of prophylactic antibiotics or prophylactic early goal directed therapy is treatment and not a screening tool.  Compliance with either EMTALA or MMC's EMTALA policy would not require administration of prophylactic treatment.

While a diagnosis of sepsis may result in early goal directed therapy, Dr. Tonnemacher did not make that diagnosis, and the only test that would have shown him that condition was the blood culture.  However, it is clear that the results of the blood culture, if administered on May

---

[11]Given this conclusion, it is unnecessary to address MMC's remaining arguments.

22, would not have been available within 6 hours.  Dr. Goldman opined that early goal directed therapy must be administered within 6 hours of presentation.  Since the results of the only test that would have actually and definitively ruled in Hoffman's bloodstream bacterial infection and changed Dr. Tonnemacher's diagnosis would not have been available until well after the 6 hour window, Dr. Tonnemacher's failure to order a CT scan, a blood culture, a CBC, and a blood sedimentation did not cause Hoffman harm.  Summary judgment is appropriate.


      Accordingly, IT IS HEREBY ORDERED that:

1.     Defendant Memorial Medical Center's motion for summary judgment is GRANTED;

2.     The pre-trial conference and trial dates are VACATED; and

3.     The Clerk is directed to enter judgment in favor Defendant and against Plaintiff and to CLOSE this case.


IT IS SO ORDERED.

**Dated:   April 10, 2008**                  **/s/ Anthony W. Ishii**
                                     UNITED STATES DISTRICT JUDGE