IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNA HOFFMAN, ) | 1:04-CV-5714  AWI DLB |
| ) | |
| Plaintiffs, ) | PRETRIAL ORDER |
| ) | |
| v. ) | Motions In Limine Hearing and |
| ) | Trial Confirmation: |
| KENT TONNEMACHER, M.D., et. al., ) | April 5, 2011 |
| ) | 10:00 a.m., Courtroom 2 |
| Defendants ) | |
| _____ ) | Trial:  April 19, 2011 |
| | 8:30 a.m., Courtroom 2 |

RULES OF CONDUCT

The pretrial conference was held on March 3, 2011.  The only defendant left in this case is Memorial Medical Center ("Defendant").  The trial in this matter is set for April 19, 2011. The parties currently estimate that the trial will take 6 days.

I.  Jurisdiction and Venue

The Court has original jurisdiction pursuant to 28 U.S.C. §§1331, 1343 and 1367, and has venue in this action pursuant to 28 U.S.C. § 1391(b).

II.  Jury Trial

The parties have invoked their rights to a jury trial under the Seventh Amendment to the United States Constitution as to all triable issues.

III.  Facts

    A.  Undisputed Facts

    None identified by the parties.

    B.  Disputed Facts

    1.      Whether the Defendant rendered emergency medical services that complied with EMTALA.

    2.      Whether the allegedly wrongful acts of the Defendant caused plaintiff any harm.

    3.      What amount of damages would fairly compensate the plaintiff for the harm that the Defendant allegedly caused.

    C.  Disputed Evidentiary Issues

    1.      Plaintiff submits the following evidentiary issues:

        a.      The plaintiff will seek to exclude the introduction of any evidence or witnesses not disclosed during discovery or provided as supplemental discovery in a timely fashion, to the extent that such information was the subject of a discovery request.

        b.      The plaintiff will also move to preclude the defense experts from testifying at trial as to the credibility of any witness, or for making factual findings.

        c.      The plaintiff will also seek to exclude any expert witnesses for whom requested discovery has not been provided.

        d.      The plaintiff will seek to exclude reference to any aspect of her medical history not germane to the issues in this case.

        e.      The plaintiff will seek to enforce the appellate evidentiary rulings and thereby prevent the defendant from introducing inadmissible evidence.

        f.      The plaintiff will move to exclude any expert testimony offered by the defendants that does not comply with FRE 701-704.

        g.      The plaintiff will move to preclude defense experts from testifying outside of their designated areas.

        h.      The plaintiff will move to preclude the defense from inferring that the plaintiff has overused Vicodin or used Vicodin without authorization.

i.      The plaintiff will move to exclude any evidence or argument that implies that she must prove that other MMC patients were treated differently.

j.      Any other motions in limine not yet anticipated will be timely filed.

2.      Defendant submits the following evidentiary issues:

Upon a mistrial, the District Court is bound by its prior rulings if identical evidentiary issues arise again. *United States v. Henley,* 984 F.2d 1040, 1045 (9th Cir. 1993); *United States v. Tham*, 960 F.2d 1391, 1397 (9th Cir. 1991).  In addition to this court's prior evidentiary rulings, and the Ninth Circuit's evidentiary rulings herein:

a.      The defendant will seek to exclude the introduction of any evidence or witnesses not disclosed during discovery or provided as supplemental discovery in a timely fashion, to the extent that such information was the subject of a discovery request.

b.      The defendant will also move to preclude the defense experts from testifying at trial as to the credibility of any witness, or for making factual findings.

c.      The defendant will also seek to exclude any expert witnesses for whom requested discovery has not been provided.

d.       Any other motions in limine not yet anticipated will be timely filed.

D.  Special Factual Information

Pursuant to Local Rule 16-281(b)(6), the following special factual information pertains to this action:

1.      Plaintiff submits the following special factual information:

a.      According to plaintiff's treatment records from May 22 and 23, 2003, she arrived via ambulance and was admitted to MMC's Emergency Department on May 22, 2003 at 8:54 p.m. with listed complaints of chills, fever, hyperventilation, severe abdominal pain, chest pain and congestion.  Plaintiff was noted to have a medical history of hypertension, hypothyroidism, Hodgkin's lymphoma, a prior splenectomy, and a heart murmur at the time of her admission.

b.      Upon presenting in the emergency room, plaintiff's fever was 102.3 degrees, her pulse was 126, her respiration was 24, and her blood pressure was 159/87.  It was

also reported that plaintiff had a prior reported fever of 106 degrees when she was at home with the ambulance crew shortly before her admission.

   c. At approximately 9:30 p.m. on May 22, plaintiff had a urinalysis and chest x-ray done, and both came back normal. No blood culture, urine culture, CBC, blood differential, or other type of test was administered.

   d. At 10:45 p.m. on May 22, plaintiff was discharged.  Plaintiff still had a 102.5 degree fever and an elevated pulse, 124, upon discharge.  The clinical impression upon discharge was fever and bronchitis, with a possible pneumonia.  Plaintiff was discharged with a prescription for Zithromycin, an oral antibiotic.

   e. Plaintiff returned to MMC's emergency room via ambulance on May 23, 2003, at approximately 4:00 p.m.  Plaintiff had an extremely high pulse and low blood pressure at the time of her return admission.  The initial clinical impression was fever and bronchitis.

   f. Upon her return, plaintiff was clearly septic and went into septic shock. Plaintiff was admitted into MMC's intensive care unit at approximately 5:30 p.m.  Initially, her prognosis was extremely poor.

   g. At 6:02 p.m. blood cultures were delivered to MMC's laboratory, and the results came back on May 24, 2003 at 4:12 a.m.  Those cultures showed that plaintiff had a virulent bacterial infection, with the streptococcus pneumonia bacteria being the identified organism.

   h. Plaintiff remained in the hospital until July 30, 2003, and was treated during that time for a severe and diffuse bacterial infection, one that resulted in her developing bacterial endocarditis (a heart infection), cyanotic toes (which required multiple amputations in August 2003), large infected wounds all over her body, and other serious complications.

   i. Prior to the incident, plaintiff was working as the manager of her apartment complex, and she still holds that same position.

   j. Plaintiff graduated from high school and has some vocational college training.

   k. Plaintiff was in good physical condition prior to the incident.

1      2.      Defendant submits the following special factual information:

2          Defendant agrees for the most part with Plaintiff's submitted "special factual

3  information" listed above, with the following exceptions:

4          a.      Defendant disagrees with Plaintiff's assertion that she  was discharged

5  *with possible pneumonia*.  Defendants' position is that the pneumonia issue was a differential

6  diagnosis prior to the x-rays being taken.  The discharge diagnosis was only fever and bronchitis.

7          b.      Defendant disagrees that Plaintiff was in good physical condition prior to

8  the incident and contend that plaintiff had a preexisting aortic valvular stenosis that necessitated

9  the aortic value replacement procedure.

10  <u>IV.  Relief Sought</u>

11         Plaintiff is requesting an award of compensatory damages.  Plaintiff is also requesting

12  attorneys fees, cost of suit and any other relief to which she may be entitled.

13  <u>V.  Points of Law</u>[1]

14         <u>A.  Plaintiff's Contentions</u>[2]

15             <u>EMTALA Claim</u>

16         In 1986 Congress enacted EMTALA, which makes hospitals liable for "refusing to

17  provide emergency medical treatment or transferring patients before their conditions were

18  stabilized." <u>Gatewood v. Washington Healthcare Corp.</u>, 933 F.2d 1037, 1039 (D.C.Cir. 1991).

19  EMTALA is not a negligence statute.  <u>See</u> <u>Summers v. Baptist Medical Center Arkadelphia</u>, 91

20  F.3d 1132, 1134-1136 (8th Cir. 1996); <u>but see Griffith v. Mt. Carmel Medical Center</u>, 831

21

22  _____

23  [1]Under the "points of law" section of the joint pre-trial statement, the parties have included a significant
amount of briefing on issues other than general "EMTALA" law.  The Court has included the entirety of the parties'
general "EMTALA" law cites and briefing.  As to other issues identified (jury instructions and causation), while the
24  Court appreciates the parties' zeal, what the parties have included under their "Points of Law" section is too much.
What the parties have submitted should really be included as part of a trial brief.  In order to make the pre-trial order
25  more manageable, the Court will provide summaries or pare down some of what the parties have submitted.  By
doing so, the Court is not intending to prejudice or limit the parties' legal contentions in this case.  The Court intends
26  the pre-trial order to reflect the legal contentions made in the pre-trial statement (unless otherwise indicated).  The
Court just does not wish to make the pre-trial statement into a duplicate version of a trial brief.

27  [2]Plaintiff also contends that there is a medical negligence claim against Defendant.  However, just as this
Court has ruled on multiple prior occasions, and for the same reasons stated on those prior occasions, no medical
28  negligence claim against Defendant will be permitted.

F.Supp. 1532, 1543 (D.Kan. 1993) (EMTALA and medical malpractice are not mutually

exclusive and the same evidence may be used to establish both claims).  To the contrary,

"[EMTALA's] core purpose is to get patients into the system who might otherwise go untreated

and be left without a remedy because traditional medical malpractice law affords no claim for

failure to treat." Bryan v. Rectors and Visitors of the Univ. of Va., 95 F.3d 349, 351 (4th Cir.

1996); see also Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 792-93 (2d Cir.

1999).  A hospital need not have a specific intent to deny an emergency patient treatment for any

discriminatory reason.  See Roberts v. Galen of Virginia, Inc., 525 U.S. 249, 250 (1999).

Instead, a hospital is strictly liable if it fails to comply with EMTALA's terms.  See Abercrombie

v. Osteopathic Hosp. Founders Ass'n, 950 F.2d 676, 681 (10th Cir. 1991); Stevison v. Enid

Health Systems, Inc., 920 F.2d 710, 713 (10th Cir. 1990) ("We construe this statute as imposing

a strict liability standard subject to those defenses available in the act.").

Instead of a universal standard of medical care, "EMTALA imposes two duties on

hospital emergency rooms: a duty to screen a patient for an emergency medical condition, and,

once an emergency condition is found, a duty to stabilize the patient before transferring or

discharging him." Baker v. Adventist Health, Inc., 260 F.3d 987, 992 (9th Cir. 2001); see 42

U.S.C. § 1395dd(a), (b).

Only the former duty is implicated in the instant matter.  Specifically, a hospital is

obligated to provide to all individuals who come to its emergency department seeking

examination or treatment, an "appropriate medical screening examination"[3] within the capability

of its emergency department, in order to determine whether an emergency medical condition

exists.  A hospital meets its obligation to provide an "appropriate medical screening" under

---

[3]EMTALA does not specifically define "appropriate medical screening examination," but states that its
purpose is to identify an "emergency medical condition." 42 U.S.C. § 1395dd(a).  42 U.S.C. §§ 1395dd(e)(1)(A)
defines an "emergency medical condition" as one:

> manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the
> absence of immediate medical attention could reasonably be expected to result in--(I) placing
> the health of the individual ... in serious jeopardy; (ii) serious impairment to bodily functions;
> or (iii) serious dysfunction of any bodily organ or part.

EMTALA when it:

> provides a patient with an examination comparable to the one offered to other patients presenting with similar symptoms, unless the examination is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.

Baker, 260 F.3d at 995.  "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly."  Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995).

In the instant matter, as regards MMC's duty under EMTALA to provide an appropriate medical screening, it is only the uniformity of treatment requirement that is at issue.  Whether a patient was disparately treated within the meaning of EMTALA turns on "whether the challenged procedure was identical to that provided [to] similarly situated patients as opposed to whether the procedure was adequate as judged by the medical profession."  Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258 (9th Cir. 1995.)  The required showing is that  the plaintiff "received materially different screening than that provided to others in her condition," rather than that she was not provided the treatment that should have been provided to a patient in plaintiff's position.  Reynolds v. Mainegeneral Health, 218 F.3d 78, 84 (1st Cir. 2000).  The failure to follow a hospital's EMTALA policy may be sufficient to support a finding of disparate treatment and thus, a finding that the hospital failed to provide an appropriate medical screening.

In the instant action, the Plaintiff's EMTALA claim that MMC failed to provide her with an appropriate screening as a result of disparate treatment implicates only the latter theory.  In other words, the EMTALA issues for trial are (1) whether Dr. Tonnemacher's screening violated MMC's own EMTALA compliance policy because he did not tailor the screening to confirm or rule out a possible condition—i.e., a bacterial process—that he himself had identified; and (2) whether this departure from MMC's compliance policy was more than a de minimus omission.  See this Court's order on MMC's motion for partial summary judgment, 26: fn. 26; Repp v. Anadarko Municipal Hospital, 43 F.3d 519, 523 (10th Cir. 1994) (a de minimus deviation from a hospital's standard screening policy is insufficient to establish a violation of EMTALA).

Finally, EMTALA applies to hospitals and makes hospitals liable for EMTALA

1  violations.  Physicians cannot be liable under EMTALA.

2       Federal courts have routinely interpreted EMTALA as not being subject to the severe

3  noneconomic damage limitations applicable to medical malpractice claims under California law,

4  see Burrows v. Redbud Community Hosp. Dist.,188 F.R.D. 356, 1358 (N.D.Cal. 1997); Jackson

5  v. East Bay Hosp., 980 F.Supp. 1341, 1344 (N.D.Cal. 1997).

6                    Jury Instruction Contentions

7       Plaintiff also contends that there are problems with two of the jury instructions that were

8  given in the previous trial.  Plaintiff has been directed to submit briefing on the jury instruction

9  issues in connection with motions in limine.

10      B.  Defendants' Contentions

11      Congress enacted EMTALA as part of the Comprehensive Omnibus Budget Reconciliation Act

12  of 1986 (COBRA), 42 U.S.C. §1395dd, to discourage hospitals from refusing to treat indigent or

13  uninsured individuals in medical emergencies - a practice known as "patient dumping." Barris v. County

14  of Los Angeles (1999) 20 Cal.4th 101, 108-109.  A hospital that has entered into a Medicare provider

15  agreement is subject to civil liability if it does not comply with EMTALA (42 U.S.C. § 1395dd(d)(2)(A);

16  Barris v. County of Los Angeles, supra, 20 Cal.4th at p. 109.

17      Under EMTALA, a hospital has two duties: (1) it must provide any individual who comes to the

18  Emergency Department requesting examination or treatment with "an appropriate medical screening

19  examination within the capability of the hospital's emergency department" in order to determine whether

20  the individual has an "emergency medical condition" (manifested by acute symptoms of sufficient

21  severity such that the absence of medical attention could reasonably be expected to result in (e.g.,

22  placing the individual's health in serious jeopardy); (2) if the hospital determines that the individual has

23  an emergency medical condition, it must provide within the staff and facilities available at the hospital

24  for "such treatment as may be required to stabilize the medical condition."  (42 U.S.C. §1395dd(a), (b),

25  (c), (e), (1) (A)).

26      At issue in this case is only the first EMTALA requirement: whether MMC provided "an

27  appropriate medical screening examination within the capability of the hospital's emergency

28  department" to determine whether an emergency medical condition existed.  (42 U.S.C. §1395dd(a).)  If

1   it provided an appropriate screening examination, the hospital's determination that HOFFMAN had no

2   emergency medical condition relieved it of any treatment obligation under EMTALA's second

3   requirement.  Indeed, the court has already granted summary judgment on this aspect of the case.

4   　　Nor is EMTALA a negligence or malpractice statute.  Repp v. Anadarko Mun. Hosp. (10th Cir.

5   1994) 43 F.3d 519, 522.  Nor does EMTALA impose on hospitals a national standard of care in

6   screening patients. ( Eberhardt v. City of Los Angeles (9th Cir. 1995) 62 F.3d 1253, 1258.)

7   　　There are two components to the required "appropriate medical screening examination."  42 U.S.C.

8   section 1395dd(a).  First, the hospital must perform a screening that is reasonably calculated to uncover

9   the existence of an emergency medical condition.  This issue has already been determined in favor of

10  defendant on its first motion for partial summary judgment.  Second, the hospital must provide the same

11  level of screening uniformly to all individuals who present substantially similar complaints - in other

12  words, as relevant here, uninsured persons must be given the same screening as insured persons.  Correa

13  v. Hospital San Francisco (1st Cir. 1995) 69 F.3d 1184, 1192 ["the essence of this requirement is that

14  there be some screening procedure, and that it be administered even-handedly."]; Gatewood v.

15  Washington Health Care Corp. (D.C. Cir. 1991) 933 F.2d 1037, 1041 [requirement met when hospital

16  applies standard screening procedure to treatment of particular patient]; Baker v. Adventist Health, Inc.

17  (9th Cir. 2001) 260 F.3d 987, 995 [hospital meets its obligation to provide "an appropriate medical

18  screening" under EMTALA when it: "provides a patient with an examination comparable to the one

19  offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not

20  "designed to identify acute and severe symptoms that alert the physician of the need for immediate

21  medical attention to prevent serious bodily injury"].

22  　　If a hospital deviated from its standard screening procedures in its screening of the plaintiff, its

23  screening may be found inadequate under EMTALA.   Repp v. Anadarko, supra, 43 F.3d at 522; Baker

24  v. Adventist Health, Inc., supra, 260 F.3d at 944.

25  　　It is plaintiff's burden to show that the hospital treated the individual differently from other

26  patients.  Marshall v. East Carroll Parish Hosp. Serv. Dist. (5th Cir. 1998) 134 F.3d 319, 323-324.

27  　　As mentioned above, the court has already granted summary judgment on two of the elements of an

28  appropriate medical screening examination: the court has already concluded that the examination given

1   by Dr. Tonnemacher was reasonably designed to identify acute and severe symptoms that would alert the

2   physician to the need for immediate medical attention to prevent serious bodily injury.  The court has

3   also determined that the issue remaining as to MMC's liability for alleged failure to screen was whether

4   the jury could infer disparate treatment if it found that Dr. Tonnemacher's screening violated MMC's

5   own compliance policy.  It has already been determined that plaintiff lacks evidence that other specific

6   patients with similar symptoms were treated differently.

7           In order to prevail, HOFFMAN is required to prove that Dr. Tonnemacher failed to comply with the

8   MMC EMTALA screening policy.  The subject policy defines the "scope" of a medical screening

9   examination as the process required to reach, with reasonable clinical confidence, the point at which it

10  can be determined whether an emergency medical condition does or does not exist.  Plaintiff must prove

11  a violation of this policy as a predicate to proving disparate treatment.  Thus, in the context of the

12  evidence of this case, plaintiff is required to prove that Dr. Tonnemacher failed to order blood tests, the

13  results of which would have led to a diagnosis of sepsis to the standard of a reasonable clinical

14  confidence, which would in turn have led Dr. Tonnemacher to institute therapy consisting of intravenous

15  antibiotics and fluids in time to have altered plaintiff's clinical course.

16          Defendant initially asserts that this issue has already been decided in its favor, in connection with

17  the court's ruling on the first summary judgment motion.  As mentioned above, the court has already

18  ruled, as a mater of law, that Dr. Tonnemacher's examination was reasonably designed to determine the

19  existence or non-existence of an emergency medical condition.  Since that is all that is required by the

20  MMC policy (to determine the existence or non-existence of an emergency medical condition to "a

21  reasonable clinical confidence"), the court has already decided the issue. It cannot be reasonably

22  disputed that performing tests to determine the existence of an emergency medical condition "to a

23  reasonable clinical confidence" is the same as conducting an examination reasonably designed to

24  determine such an emergency condition.  It cannot be reasonably said that if a doctor conducts an

25  examination reasonably calculated to determine the existence of an emergency condition, that he did not

26  perform all that is required to be reasonably confident in his determination.  To argue otherwise is sheer

27  sophistry.

28          A second point is also of critical importance. The inquiry at trial is limited to the question of

1  whether an appropriate screening was performed. It is completely irrelevant whether Dr. Tonnemacher

2  should have or negligently failed to continue to observe plaintiff, admit plaintiff into a hospital, or

3  perform any other type of stabilization or treatment.  Defendant will be making an appropriate motion in

4  limine to preclude this type of evidence which has and will result in significant confusion to the jury and

5  consumption of time.

6      For instance, in Dr. Peggy Goldman's "Further Supplemental Declaration" dated December 11,

7  2010, Dr. Goldman states the opinion that Dr. Tonnemacher violated the MMC EMTALA policy by

8  discharging plaintiff without ruling out to a degree of reasonable clinical confidence the possibility of a

9  bacterial blood infection.  The same testimony was admitted at the last trial, resulting in considerable

10  confusion of the issues.  The issue is limited to whether there were any tests available to Dr.

11  Tonnemacher which would have determined the existence of a bacterial infection of the blood "to a

12  reasonable clinical confidence."  This is not a failure to stabilize or treat case.  The issue is not whether

13  Dr. Tonnemacher should have discharged plaintiff without reasonable confidence that he had ruled out

14  such a bacterial infection.  This type of evidence is entirely irrelevant and confusing to the jury and

15  should be excluded.

16      Negligence in the screening process or the provision of a merely faulty screening, as opposed to

17  refusing to screen or disparate screening, does not violate EMTALA.  Negligent medical treatment is not

18  the same as disparate screening under EMTALA. Jackson v. East Bay Hospital, 246 F.3d 248, 255-56

19  (9th Cir. 2001).  A hospital does not violate EMTALA if it fails to detect or misdiagnoses an emergency

20  condition. Bryant v. Adventist Health System West, 289 F.3d 1162, 1165 (9th Cir. 2002).

21      To recover for disparate treatment, the plaintiff must proffer evidence "sufficient to support a finding

22  that she received materially different screening than that provided to others in her condition.  It is not

23  enough to proffer expert testimony as to what treatment should have been provided to a patient in the

24  plaintiff's position." Reynolds v. Mainegeneral Health, 218 F.3d 78, 84 (1st Cir. 2000). "It is the

25  plaintiff's burden to show that the hospital treated her differently from other patients; the hospital is not

26  required to show that it had a uniform screening procedure." Marshall v. East Carroll Parish Hosp. Serv.,

27  134 F.3d 319, 323-24 (5th Cir. 1998).  Failure to follow a hospital's EMTALA policy may be sufficient

28  to support a finding of disparate treatment and thus, a finding that the hospital failed to provide an

appropriate medical screening.  Baker v. Adventist Health, Inc., supra, 260 F.3d at 994; Battle v.

Memorial Hospital, 228 F.3d 544, 585 (5 Cir. 2000).

Thus, in this case, if the jury finds that Dr. Tonnemacher failed to perform tests which would have

confirmed or ruled out a bacterial process within the six hour window, the jury can then infer disparate

treatment, although it need not.  Failure to follow the EMTALA policy is nothing other than

circumstantial evidence of disparate treatment.  It is not the ultimate question.

### Causation

Evidence of causation must rise to the level of a reasonable probability based upon competent

testimony.  The defendant's conduct is not the cause in fact of harm where the evidence indicates that

there is less than a probability, i.e. 50/50 possibility or a mere chance, "that the harm would have ensued.

[citations.]"  Williams v. Wraxall (1995) 33 Cal.App.4th 120, 133; Dumas v. Cooney, supra, 235

Cal.App.3d at 1603; Simmons v. West Covina Medical Clinic (1989) 212 Cal.App.3d 696, 702-703;

Jones v. Ortho Pharmaceutical Corp. (1985) 163 Cal.App.3d 396, 402-403. California adheres to the

reasonable medical probability standard, and has rejected the lost chance theory.  Simmons v. West

Covina Medical Clinic, supra, 212 Cal.App.3d 696; Dumas v. Cooney, supra, 235 Cal.App.3d 1593;

Bromme v. Pavitt, supra, 5 Cal.App.4th 1487.  California does not recognize the theory of "lost chance"

that permits recovery even though the evidence shows no more than better than even chance that a

defendant caused a plaintiff's loss.

Defendants contend that Plaintiff's causation evidence improperly relies on the lost chance

theory and does not meet the required medical probability standard.  Defendants contend that Plaintiff

cannot meet her burden on the issue of causation.

### Jury Instruction Contention

Defendant also contends that a jury instruction under California Civil Code §§ 1431, 143.2 is

appropriate.  Defendant has been directed to submit briefing on the jury instruction issues in connection

with motions in limine.

### VI.  Abandoned Issues

None.

VII.  Witnesses

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses.  NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 281(b)(10).

A.  Plaintiffs' Witnesses

1.     Donna Hoffman

2.     Donna Gonzales

3.     Gerald Sisto

4.     Jannet Sisto

5.     Dr. David Olson

6.     Dr. Peggy Goldman

7.     Dr. Daniel Thwaites

8.     Dr. Scott Oslund

9.     Dr. Robert Coronado

10.    Dr. Joe Neal

11.    Dr. William J. Kalanta

12.    Dr. Kent Tonnemacher

13.    Laura Vejar

14.    Plaintiff's other providers identified during discovery

15.    Plaintiff's other designated non-retained experts

16.    Any other witnesses identified during discovery erroneously omitted herein

17.    Any witnesses named by the defendants

18.    Custodians of records for any records whose authenticity is not stipulated

B.  Defendants' Witnesses

1.     Defendant Kent Tonnemacher, M.D.

2.     Dr. Joe Neil

3.    Michael J. Bressler, M.D.

4.    Penny Hastie

5.    Barbara Osburn, R.N.

6.    Lory David Wiviott, M.D.

7.    Other witnesses disclosed by other parties to this action.

VIII.  Exhibits

        The following is a list of documents or other exhibits that the parties expect to offer at trial.  NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 281(b)(11).

        A.  Plaintiffs' Exhibits

1.    Video of Plaintiff during her hospital admission

2.    Photographs of plaintiff's injuries produced in discovery by both parties

3.    Plaintiff's medical, billing and prescription records from Memorial Medical Center, Doctor's Medical Center, Department of health Services, Walgreen's, Oakdale Foot Care, Admar Med Net, American Medical Response, Central Financial Control, Dr. William J. Kalanta, and the other various medical providers identified during discovery

4.    Memorial Medical Center's EMTALA policy

5.    Defendants' discovery responses, including produced documents

6.    Deposition of Penny Hastie and depositions of any witnesses deemed unavailable by the Court

7.    Demonstrative aids and learned materials employed by expert witnesses

8.    Any exhibit identified by the defendants

9.    Any records produced during discovery erroneously omitted herein

        B.  Defendants' Exhibits

1.    Plaintiff's medical records from her treatment at Memorial Medical Center

2.    Plaintiff's discovery responses, including produced documents

3.    Depositions of any witnesses

4.    Memorial Medical Center Emergency/Prompt Care Department Fever Guideline

5.      Memorial Medical Center EMTALA Compliance Policy

IX.  Discovery Documents To Be Used At Trial (Answers To Interrogatories And Responses To Requests For Admissions

Plaintiff intends to introduce certain of the defendant's responses to her requests for admissions, interrogatories, document requests, declarations and depositions as admissions of a party opponent. Plaintiff also intends to use the deposition of Penny Hastie and the other depositions taken in this action for all purposes allowed under the Federal Rules of Civil Procedure and Evidence.

X.  Further Discovery or Motions

Since the September 2011 mistrial, the plaintiff has provided supplemental discovery to the defense, to wit: additional medical billing records recently obtained from Doctor's Medical Center, and a supplemental declaration from Dr. Goldman, with attached exhibits.  The plaintiff has also indicated that she would be willing to entertain any follow-up discovery the defendant thought appropriate, but no such discovery has been proposed or propounded.

The parties intend to file motions in limine, as described in section V.

XI.  Stipulations

The parties propose that stipulation to the authenticity of the documentary evidence exchanged during discovery or to which there is no controversy as to authenticity will further the efficient resolution of this action.

Additionally, the parties informed the Court of a stipulation to using the prior testimony of Drs. Thwaites and Kalanta, in lieu of live testimony, during Plaintiff's case in chief on direct exam.[4]

XII.  Amendments/Dismissals

None.

XIII.  Settlement Negotiations

The parties have not been able to settle this case, or even to engage in meaningful settlement discussions.

---

[4]If the Court's understanding is incorrect, the parties are to inform the Court of the correct meaning of the stipulation on April 5, 2011, at the hearing on motions in limine.

XIV.  Agreed Statement

The parties do not believe that a presentation of all or part of this action upon an agreed statement of facts is feasible or advisable.

XV.  Separate Trial Of Issues

There will be no separate trial of the issues.

XVI.  Impartial Experts - Limitation Of Experts

The parties do not believe that the Court's appointment of an expert or the limitation on the number of experts is advisable.

XVII.  Attorneys' Fees

Plaintiff may be requesting attorneys fees to the extent that applicable law might make them recoverable as a discretionary matter.

XVIII.  Further Trial Preparation

A.  Final Witness List

The parties are ordered to file and serve their final list of witnesses by April 14, 2011 . Additionally, at that time Plaintiffs shall disclose the order of witnesses so that Defendants will be prepared for cross-examination.

Except upon the showing set forth above in section VII, a party may not add witnesses to the final list of witnesses, or to any other updated witness list, who are not disclosed in this Order in Section VII.

B.  Trial Briefs

The parties are directed to file and serve a Trial Brief by March 28, 2011.  Local Rule 285.  The parties need not include in the Trial Brief any issue that is adequately addressed in a motion in limine, or in an opposition brief to a motion in limine.

C.  Duty of Counsel to Pre-Mark Exhibits

The parties are ordered to confer no later than April 1, 2011, for purposes of pre-marking and examining each other's exhibits.  All joint exhibits must be pre-marked with numbers preceded by the designation JT/-- (e.g., JT/1, JT/2).  All of Plaintiffs' exhibits shall be pre-marked with numbers.  All of Defendants' exhibits shall be pre-marked with letters.

1.  Counsel shall create four (4) complete, legible sets of exhibits in binders as follows:

(a) Two sets of binders to be delivered to Courtroom Clerk Harold Nazaroff on  April 14, 2011, one for use by the Courtroom Clerk and the other for the court; and

(b)  One set for each counsel's own use.

If the parties desire, they may have a fifth set of binders to be used for the purposes of questioning witnesses.

2.  Counsel are to confer and make the following determination with respect to each proposed exhibit to be introduced into evidence, and to prepare separate indexes - one listing joint exhibits, and one listing each party's separate exhibits:

(a)  Duplicate exhibits, i.e., documents which both sides desire to introduce into evidence, shall be marked as a joint exhibit, and numbered as directed above.  Joint exhibits shall be listed on a separate index, and shall be admitted into evidence on the motion of any party, without further foundation.

(b)  As to exhibits that are not jointly offered, and to which there is no objection to introduction, those exhibits will likewise be appropriately marked, e.g., Plaintiffs' Exhibit 1 or Defendants' Exhibit A, and shall  be listed in the offering party's index in a column entitled "Admitted In Evidence."  Such exhibits will be admitted upon introduction and motion of the party, without further foundation.

(c)  Those exhibits to which the only objection is a lack of foundation shall be marked appropriately, e.g., Plaintiffs' Exhibit 2 - For Identification, or Defendants' Exhibit B - For Identification, and indexed in a column entitled "Objection Foundation."

(d) Remaining exhibits as to which there are objections to admissibility not solely based on a lack of foundation shall likewise be marked appropriately, e.g., Plaintiffs' Exhibit 3 - For Identification or Defendants' Exhibit C - For Identification, and indexed in a third column entitled "Other Objection" on the offering party's index.

3.  Each separate index shall consist of the exhibit number or letter, a brief description of the exhibit, and the three columns outlined above, as demonstrated in the example below:

INDEX OF EXHIBITS

| EXHIBIT # | DESCRIPTION | ADMITTED IN EVIDENCE | OBJECTION FOUNDATION | OTHER OBJECTION |
|---|---|---|---|---|

Two sets of the completed joint index and the separate indexes shall be delivered to the Courtroom Clerk with the two sets of binders on April 14, 2011.

The court has no objection to counsel using copies.  However, the copies must be legible.  If any document is offered into evidence that is partially illegible, the court may *sua sponte* exclude it from evidence.

### D.  Discovery Documents

By April 14, 2011, each party shall file a list of all discovery documents the party intends to use at trial.  The list shall indicate whether each discovery document has previously been lodged with the Clerk.  If the discovery document has not been previously lodged, the party shall so lodge the document with the Courtroom Clerk by April 14, 2011.

### E.  Motions In Limine Hearing and Briefing Schedule

The hearing for motions in limine will be held on April 5, 2010, at 10:00 a.m.  In addition to addressing any filed motions in limine, at that time the court will also settle, to the extent possible, any other matter pertaining to the conduct of the trial.

Counsel are expected to be fully cognizant of the legal issues involved in the case by the date of the hearing for motions in limine.

By 4:00 p.m. on March 21, 2011, all motions in limine, with supporting points and authorities, shall be filed and served either personally or by facsimile upon opposing counsel.

By 4:00 p.m. on March 28, 2011, opposition to any motion in limine shall be filed and served either personally or by facsimile upon opposing counsel.  If a party does not oppose a motion in limine, that party shall file and serve in the same manner a Statement of Non-Opposition to that motion in limine.

By 4:00 p.m. on March 31, 2011, any reply to an opposition shall be filed and served either personally or by facsimile upon opposing counsel.  Because the court will need time to prepare for the hearing on April 5, 2011, the court is not inclined to consider late reply briefs.

18

1       F.  Morning Conferences During Trial

2         During the trial, it is the obligation of counsel to meet with the court each morning to advise the

3 court and opposing counsel as to what documents are proposed to be put into evidence that have not

4 previously been admitted by stipulation, court order, or otherwise ruled upon.  The court will rule on

5 those documents, to the extent possible, prior to the commencement of trial each day out of the presence

6 of the jury.  If the ruling depends upon the receipt of testimony, the court will rule as requested upon the

7 receipt of such testimony.

8         The court shall consider any other legal matter at morning conferences as well.  The court does

9 not wish to recess the trial to hear legal argument outside of the presence of the jury, and proper

10 preparation by counsel will eliminate the need for that result.

11       G.  Order Of Witnesses

12         In order to make the trial operate efficiently and smoothly, each counsel has the continuing

13 obligation to advise opposing counsel as to what witnesses he or she intends to call at each trial session.

14 XIX.  Objections to Pretrial Order

15         Any party may, within ten (10) calendar days after the date of service of this order, file and serve

16 written objections to any of the provisions of this order.  Local Rule 283.  Such objection shall specify

17 the requested corrections, additions or deletions.

18 XX.   Proposed Voir Dire Questions

19         The parties shall submit proposed voir dire questions with the Courtroom Clerk on April 14,

20 2011.

21 XXI.   Neutral Statement

22         The parties shall submit an agreed neutral statement of the case, which the Court will read to the

23 jury panel, on April 14, 2011.  The Court emphasizes, and will so instruct the jury panel, that the neutral

24 statement is not evidence, but is instead intended to provide the jury with a general overview of the case.

25 XXII.  Proposed Jury Instructions

26         The parties shall submit proposed jury instructions with the Courtroom Clerk on April 14, 2011.

27 XXIII. Proposed Verdict Form

28         The parties shall file proposed verdict forms with the Courtroom Clerk on April 14, 2011.  The

parties shall use best efforts to attempt to file an agreed upon verdict form.

XIV.  Rules of Conduct During Trial

    A.  General Rules

    1.  All participants in the trial shall conduct themselves in a civil manner.  There shall be no hostile interchanges between any of the participants.

    2.  All oral presentations shall be made from the podium, unless otherwise permitted by the court.

    3.  Sidebar conferences are discouraged.  Legal arguments or discussion of issues outside the presence of the jury should be done during recesses.

    4.  Counsel shall advise their respective clients and witnesses not to discuss any aspect of the case in the common areas of the courthouse accessible to the jurors, such as the lobby, the elevators, the hallways and the cafeteria.

    B.  Jury Selection

    1.  The court will conduct voir dire to be supplemented by any written questions submitted by counsel prior to trial and after the court has concluded its questioning of the jury panel.  In some circumstances, the court may allow brief direct questioning by counsel.

    C.  Opening Statements

    1.  Counsel may use visual aids in presenting the opening statement.  However, any proposed visual aids shall be shown to opposing counsel before opening statement.

    D.  Case in Chief

    1.  Counsel shall have his/her witnesses readily available to testify so that there are no delays in the presentation of evidence to the trier of fact.

    2.  At the close of each trial day, counsel shall disclose his/her anticipated witnesses and order of presentation for the next day, so that any scheduling or evidentiary issues may be raised at that time.

    E.  Witnesses

    1.  Before approaching a witness, counsel shall secure leave of court to approach the witness.

2.  Before approaching a witness with a writing, counsel shall first show the writing to opposing counsel.

F.  Exhibits

1.  All exhibits shall be marked and identified in accordance with the instructions in the Pretrial Order.

2.  An exhibit shall not be published to the jury until it has been admitted into evidence and counsel has secured leave of court to publish the exhibit.

3.  The court usually will conduct an on the record review of the exhibits that have been admitted in evidence at the conclusion of each party's case in chief and after each party has rested its entire case.

G.  Objections

1.  No speaking objections or arguments are permitted in the presence of the jury. Counsel shall state the specific legal ground(s) for the objection, and the court will rule based upon the ground(s) stated.  The court will permit counsel to argue the matter at the next recess.

2.  The court will not assume that any objection made also implies with it a motion to strike an answer that has been given.  Therefore, counsel who has made an objection, and who also wishes to have an answer stricken, shall also specifically move to strike the answer.

H.  Closing Argument

1.  Counsel may use visual aids in presenting the closing argument.  However, any proposed visual aids shall be shown to opposing counsel before closing argument.


FAILURE TO COMPLY WITH ALL PROVISIONS OF THIS ORDER MAY BE GROUNDS FOR THE IMPOSITION OF SANCTIONS, INCLUDING POSSIBLE DISMISSAL OF THIS ACTION OR ENTRY OF DEFAULT, ON ANY AND ALL COUNSEL AS WELL AS ON ANY PARTY WHO CAUSES NON-COMPLIANCE WITH THIS ORDER.

IT IS SO ORDERED.

Dated:   March 3, 2011      _____

                                    CHIEF UNITED STATES DISTRICT JUDGE